## THE AMERICAN INSURANCE COMPANY *vs.* COSTER and others.

The master of a ship in a foreign port may, in a case of necessity, sell a part or hypothecate the whole of the cargo to repair the ship, for the purpose of enabling him to complete the voyage.

Where the master is compelled to use his own private funds, or to take the property of a shipper, for the repair of the ship in a foreign port, the master or shipper has a lien upon the ship for the expenses of such repairs, although there is no actual hypothecation thereof.

If an individual makes a voluntary loan to the master for the repair of the ship, and takes other security for the loan without reserving to himself a lien upon the ship, the lien is waived.

The lien upon a ship, for repairs furnished in a foreign port, must be enforced within a reasonable time, or the ship will not be liable therefor in the hands of a bona fide assignee.

1832.

The American Ins. Co.
v.
Coster.

But it will be sufficient, if the party entitled to the lien proceeds to enforce it within a reasonable time after the termination of the voyage upon which the repairs were made, and before the ship sails upon a second voyage.

The ordinary mode of obtaining the benefit of a lien on the ship, is by a proceeding in rem in the instance court of admiralty. But where the court of chancery has the administration of a fund arising from a sale of the ship, in a suit for the settlement of the accounts between the joint owners, that court is authorized to take cognizance of such a claim, for the purpose of making an equitable distribution of the proceeds of the ship.

Where several persons had a joint interest in a ship and cargo, in the nature of a limited partnership, and an insurance company loaned money to one of the partners, with the assent of the copartners, upon respondentia upon his interest in the cargo only, and a part of the cargo was afterwards sold by the master for the repair of the ship; *Held*, that the insurance company was entitled to claim a remuneration pro tanto out of the proceeds of a sale of the ship.

Where defendants are brought before the court as merely formal but necessary parties, and without any fault on their prrt, they may sometimes be entitled to their costs against the complainant; and he will in that case have his remedy over for those costs, against the other defendants who have rendered the litigation necessary.

May 28.   THE bill in this cause was filed by the complainants to obtain a portion of the proceeds of the sale of the ship Adonis. The cause was heard upon bill and answer, as to the defendants who had any real interest in the controversy. The facts, as they appeared from the pleadings, were as follows: About the first of March, 1822, the defendants, J. G. Coster and R. M. Lawrence, together with J. Jones and J. Clinch then composing the firm of Jones & Clinch, and W. C. Barker and R. Hopkins, partners under the name of Barker & Hopkins, agreed to undertake a mercantile adventure to Calcutta, and thence back to New-York. Each of the parties were to contribute and advance their proportions of the cost and outfit of the ship and cargo, upon their own account and responsibility, and on the return of the ship to New-York she was to be sold and the concerns of the adventure closed. The firms of Jones & Clinch and Barker & Hopkins each contributed $12,500 for their respective proportions of the cargo; which sums they borrowed of the complainants, on respondentia, upon the goods and specie laden or to be laden on board the Adonis on account of the borrowers at any time during the intended voyage. The respondentia bond was dated the 18th of

March, 1822, and was executed by all the members of the two firms, jointly and severally. And by an agreement signed by them, reciting that the bills of lading for the goods, &c. mentioned in the bond were to be assigned to the complainants as a further collateral security for the loan, it was stipulated that such assignment should not exonerate the obligees from personal responsibility, or compel the complainants to accept the goods in discharge of their debt; and that if the money was not paid on the arrival of the goods at New-York, or within two months thereafter, the complainants might then sell them at auction, and credit the proceeds on the bond. Goods to the amount of $38,882,05 were laden on board the ship, in which goods the share of each firm was $12,500, Coster's share $10,000, and the share of Lawrence was $3882,05; and their respective interests in the ship were in the same proportion. It was also agreed between all the partners, that at the termination of the voyage, the profits or loss of the adventure should be borne by them in the same ratio. On the 30th of March, a bill of lading of the cargo was delivered to the complainants, with an endorsement thereon, by Barker & Hopkins and Jones & Clinch, assigning their interest in the same and in the goods therein mentioned, and in the goods to be invested or procured therefrom, and also in the return cargo, as collateral security, according to the agreement endorsed on the respondentia bond. Coster and Lawrence knew of the arrangement relative to the loan from the complainants, and the manner in which it was secured; but they had no personal interest therein, except such as arose from the joint ownership of the ship and cargo. The Adonis sailed from New-York in April, and arrived at Calcutta in July, 1822. The ship sustained sea damage on the voyage; and for the repairs therof at Calcutta, after exhausting the other funds of the owners, the master was obliged to appropriate $4701,49 of the proceeds of the outward cargo. In August, 1822, during the absence of the ship, Jones & Clinch became insolvent, and assigned their interest in the ship and cargo to F. H. Nicholl and N. Scovill, in trust for certain of their creditors. Barker & Hopkins also became insolvent about the same time, and Hopkins died shortly afterwards. On the 20th of August, in the same year,

Barker, as the surviving partner, assigned the interest of that firm in the ship and cargo to B. Chase and R. McQueen, in trust for certain creditors of that company. The ship arrived at New-York with her return cargo the latter part of March, 1823. Shortly thereafter an arrangement was made between the complainants and the former owners of the ship and cargo and their assignees, by which the cargo was sold and the proceeds thereof distributed between Coster, Lawrence and the complainants, according to their original interests in the outward cargo; the complainants taking the shares of Jones & Clinch and Barker & Hopkins. But the sums thus received by the complainants fell considerably short of the amount due to them on the respondentia bond, leaving the deficiency much greater than it would have been had not a portion of the proceeds of the outward cargo been taken for the purpose of repairing the ship. By another agreement between Coster & Lawrence and the assignees of Jones & Clinch and Barker & Hopkins, made about the same time, the ship was placed in the hands of Coster to be sold. The complainants gave notice to him of their claim upon a part of the proceeds of the ship, to remunerate them for their interest in that part of the proceeds of the outward cargo which had been appropriated by the master for repairs. But Coster, being indemnified by the assignees, sold the ship and paid over to them their share of the proceeds, after adjusting certain unsettled accounts relative to the adventure. Barker died insolvent, and his personal representative was made a defendant. Jones & Clinch were discharged under the act to abolish imprisonment for debt in certain cases, and their respective assignees were also made defendants in this suit.

*J. Duer*, for the complainants, contended,

1. That the complainants, by the investment of their funds in the repairs of the ship, acquired a lien upon her, or at least upon the shares of Jones & Clinch and Barker & Hopkins, to the amount of the funds so invested, as well from the nature of their contract as by the general principles of maritime law.

2. That the owners of the ship, all and every of them, were liable for the funds so invested, as for money paid to their use.

3. That they were all and every of them liable for the tortious act of the master in applying the cargo of the complainants to the repairs of the ship when the property of the owners was under his control.

4. That the defendant Coster was individually liable for paying over the proceeds of the ship, after receiving express notice of the claim of the complainants.

And in support of the points thus made by him, the counsel cited *Taylor* v. *Plumer*, 3 *Maule & Selw.* 562, 574; *Abbot on Shipping*, last ed. p. 116, note, per *J. Story*, n. 125, n. 2; *Amerigon Marit. Laws*, 234; *Com. Code*, Book 2, tit. 1, art. 191; *Cowp. Rep.* 626; *Farmer and another* v. *Davies*, 1 *Term R.* 109; *Peters' Adm. Dec.* 223; *O'Hara* v. *Ship Mary*, *Bees' Adm. Rep.* 100; 1 *Wheat.* 105; 4 *Id.* 443; 2 *Gal.* 345; 3 *Mason's Rep.* 261; 3 *Robinson's Adm. Rep.* 240, 264; *American ed.* 190. To establish the position that chancery had concurrent jurisdiction with the courts of admiralty, in cases like the present, the counsel cited 2 *Pr. Wms.* 367; *Ex parte Shank*, 1 *Atk.* 234; *Halcott*, 1 *Ves. & B.* 135; *Hussy* v. *Christy*, 13 *Ves.* 594.

*W. Slosson*, for defendants Coster & Lawrence and Nichol & Scovill, contended,

1. That the respondentia bond and the hypothecation of the interest of Barker & Hopkins and Jones & Clinch in the goods brought by them into the joint adventure, was subject to a prior right in those jointly concerned in the adventure.

2. That the cargo, in default of other resources, was the proper fund for the repairs of the vessel.

3. That the appropriation of a part of the cargo to that object gave no lien to the complainants upon the vessel.

4. That if there was a lien, it was subject to the prior rights of the other partners in the adventure.

5. That the notice to Coster not to pay over the proportions of the proceeds of the ship belonging to the assignees of Barker & Hopkins and Jones & Clinch was inoperative, and could not subject him to responsibility, as the assignees were entitled to the possession of such proceeds.

6. That Richard M. Lawrence, who has merely received his proportion, was not liable to the complainants.

7. That John G. Coster, for the like reason, was not liable, in respect of his own proportion ; nor was he liable for the proportions paid over by him to the assignees of Barker & Hopkins and of Jones & Clinch.

8. That Nichol & Scovill, the assignees of Jones & Clinch, were not liable ; the assignment to them being of the ship on which the complainants had no lien.

And in support of these points, the counsel cited *Laville* v. *Robinson*, 4 *D. & E.* 720 ; *Gow on Part.* 31 *and* 33 ; *Post* v. *Kimberly*, 9 *John. R.* 488, 9 ; 3 *Kent's Comm.* 13 ; 1 *Wash. C. C.* 49 ; *Whar. Dig.* 539, *sec.* 34 *to* 42 ; *Hussy* v. *Christy*, 13 *Ves.* 596 ; *Hussy* v. *Christy and others*, 9 *East*, 426 ; *Depau* v. *Ocean Ins. Co.*, 5 *Cow.* 63. As to the point that the complainants' lien, if any, could only be enforced in a court of admiralty, the counsel cited *Novion* v. *Hallet*, (16 *John. Rep.* 327 ;) *Le Caux* v. *Eden*, (*Doug.* 594.)

*J. Fessenden,* for Chase and McQueen, contended,

1. That the respondentia bond and endorsement of the bill of lading mentioned in the bill, coupled with the appropriation of part of the proceeds of the outward cargo of the ship Adonis, to repair her abroad, did not give the complainants a lien upon the ship ; and that they were nothing more than ordinary creditors of the estate of Barker & Hopkins, by reason of such appropriation and of any part of said bond's remaining unpaid.

2. That if the respondentia bond, &c. and the appropriation of a part of the outward cargo for repairs gave the complainants a lien on said ship, it was one which could only be enforced in a court of admiralty, by a libel against the ship ; and that the court of chancery had no jurisdiction thereof.

3. That the defendants Chase and McQueen were not, in any event, personally liable to the complainants for any thing.

He cited 2 *Black. Comm.* 488. *Dicky* v. *Ocean Ins. Co.*, 4 *Cow.* 222 ; *Depeau* v. *Ocean Ins. Co.*, 5 *Id.* 63 ; *Hussy* v. *Christy*, 9 *East*, 426 ; and 2 *Gal. R.* 474 ; *United States* v. *Bevans*, 3 *Wheat.* 336 ; *Martin* v. *Hunter's Lessee*, 1

*Id.* 337 ; *Houston* v. *Moore,* 5 *Id.* 49 ; *Thompson* v. *Brown,* 4 *John. Ch. R.* 619.)

C. D. *Sackett,* for assignees of Jones, under the insolvent act.

THE CHANCELLOR. By the two several assignments to Nicholl & Scovill and to Chase & McQueén, in August, 1822, they acquired the entire interest of the two insolvent firms in the ship Adonis ; but as it has resulted, they took no interest whatever in the cargo, the whole of the share of the two firms in that being insufficient to discharge the complainants' admitted lien thereon. Those assignees cannot, however, in any event, be personally liable to the complainants beyond the sums actually received by them out of the proceeds of the sale of the ship. If it had appeared that they were part owners of the ship, by the assignment, at the time the repairs were made, as the complainants' property has been taken by the master to make those repairs, in a case of necessity, they would have been personally liable as owners, independent of the question of maritime lien. The only evidence in this case, as to the time when the repairs were made, is, that the ship arrived at Calcutta in July and that the proceeds of the cargo were applied to pay for those repairs after that time. As the assignments were not made until the latter part of August, I think it may be fairly inferred that the application of the funds for repairs was made before the assignees became part owners of the ship. The assignees, however, took the right of the insolvents in the ship subject to any maritime lien, or equitable claim which existed against it at the times of their respective assignments. It therefore becomes necessary to enquire whether any such claim or lien existed in favor of the complainants at that time.

By the maritime law, and the laws of most countries where the civil law prevails, a tacit hypothec or lien upon the ship, is given, without any express contract to that effect, in favor of a person who makes repairs, or furnishes funds to the master which are applied for that purpose, whether such re-

pairs are made in a home port or abroad.   (3 *Kent's Comm.* 168.)    The same doctrine once prevailed in the maritime courts of England ; but after a long contest between the admiralty and the common law courts of that country, the latter finally succeeded in narrowing down the doctrine so far as to deprive the master of a domestic ship, or even of a foreign ship within the limits of an English country, of the power of hypothecating the ship for any purpose whatever.    But I am not aware that it has ever been decided there that an express hypothecation of the ship is necessary to retain the lien in favor of the person who makes the repairs, or furnishes the means, on the credit of the ship, though some of the recent dicta of English judges seem to favor that supposition.   (*See* 1 *Haggard's Adm. Rep.* 325.)    Lord Mansfield, however, held a different language on this subject, in *Rich* v. *Coe*, (*Cowp. Rep.* 639.)    He there says, " Whoever supplies a ship with necessaries has a treble security : 1. The person of the master ; 2. The specific ship ; 3. The personal security of the owners."    And in the case of *Farmer* v. *Davies*, (1 *Durn. & East*, 639,) he is equally explicit in declaring the right to a specific lien on the ship itself for the repairs furnished.    It is true Lord Kenyon afterwards expressed an opinion that this doctrine had been laid down by Lord Mansfield too generally.   (7 *Durn. & East*, 312.)    But his doubts do not appear to have been founded upon the supposed necessity of an actual hypothecation, to obtain a lien on the ship ; for he refers to a case before Sir Joseph Jekyll, in 1726, (2 *Peer Wms. Rep.* 367,) and another before Lord Hardwicke, in 1748, (1 *Ves. sen.* 155,) as the authorities opposed to the opinion of Lord Mansfield.    By referring to those cases it will be found they turned upon the distinction between repairs made in an English port and in a foreign country.    It must, therefore, have been in this respect merely that the language of Lord Mansfield was thought to have been too general ; he not having noticed that distinction. In *Ex parte Shank*, which came before Lord Hardwicke in 1754, (1 *Atk. Rep.* 234,) the distinction between foreign and domestic repairs was taken ; and it was admitted that there would have been a lien in that case, if the repairs had been

made in a foreign port while the ship was out on a voyage. Nothing, however, is there said as to the necessity of an express hypothecation of the ship by the master. It is true the usual practice is to give a bottomry bond. But the principal object of that is to furnish the person, who has made the advances, or done the repairs, with written evidence of his claim, and to enable him to recover marine interest on the loan. Where the person making the repairs, or furnishing the means for that purpose, is in a situation to contract for and obtain an express hypothecation, there certainly can be no grounds of public policy against a rule which would require of him a compliance with that formality; provided that rule was generally adopted among maritime nations. And if he accepts other security for his loan, or contracts for a specific term of credit for the repairs, the presumption is against the existence of the lien, unless it is expressly reserved. So long, however, as the tacit hypothec is considered sufficient by nearly all the commercial nations of the world, it would probably be unwise and inexpedient for us to adopt a different rule. We have gone far enough in following our English ancestors in their departure from the maritime law as to repairs in a home port. But in this respect the courts of this country have not thought it expedient to follow the English decisions which deprive the master of a foreign ship of the power to pledge the vessel for repairs in an English port. And several of our state legislatures have found it necessary, by statute, to restore the principle of the civil law, giving a lien in favor of the person making repairs upon a domestic vessel in a home port.

Whatever may be the law in England, as to the necessity of an express hypothecation to give a legal lien for repairs, or for means furnished for that purpose, by voluntary loan, in a foreign port, it cannot, in principle, be extended to a case where, from the very nature of the loan, it is impossible that there should be an actual hypothecation. Such is in reality the case when the master is compelled to use his private property, or to expend his own funds, for the repair of the ship in a foreign port, or is obliged to take the property of a shipper for the same purpose in the nature of a forced loan. As the mas-

1832.

The American
Ins. Co.
v.
Coster.

ter cannot, by an express contract, mortgage the property to himself in the first case, and the owner of the cargo, who is not present, has no opportunity to protect his own rights in the second, they must be without remedy as against the ship unless a tacit hypothec can be created by operation of law merely. In the case of *Van Bokkelin* v. *Ingersol*, in the court for the correction of errors, (5 *Wend. Rep.* 315,) I expressed my opinion as to the right of the master to a lien, both on the ship and freight, for supplies necessarily furnished by him in a foreign port for the purposes of the voyage.

It is well settled that the master, in a foreign port, under certain circumstances, may sell a part or hypothecate the whole of the cargo to repair the ship, and thus enable him to complete the voyage. (*The Gratitudine*, 3 *Rob. Adm. Rep.* 263. 3 *Kent's Com.* 173. *Per Best, J.*, 5 *Barn. & Ald.* 619. *Code of Com. art.* 234.) In the case of *Depau* v. *The Ocean Ins. Co.*, (5 *Cowen's R.* 63,) where a part of the cargo was sold at the port of necessity to repair the ship, the chief justice held that this created no lien on the ship for those expenses. If the cargo belonged to the owner of the ship, as in the case of *Dickey* v. *The New-York Ins. Co.* to which he referred, that dictum was certainly correct. But if it was supposed that a third person, whose goods were taken for the repairs of the ship in a case of necessity, had no lien upon the ship to make good the loss, that opinion must have been expressed without a full examination of the law on this subject. Upon every principle of justice and equity, the owner of the cargo, whose property is thus taken for the benefit of the ship by way of a forced loan, has a right to look to the security of the ship as well as to the individual responsibility of the ship owner for remuneration. It will also be found, on examination, that the rule of the commercial law is in accordance with this principle of natural equity. By the laws of Wisbuy, the ancient capital of Gothland in the Baltic, which now form the foundation of the maritime laws of the north of Europe, a lien was given upon the ship in favor of the owner of the cargo whose property had been sold by the master for necessary repairs. (*Laws of Wisb. art.* 45. *Cleirac*, 176.) Although the marine ordinance of Lewis the 14th did not in terms give such a lien, yet

the master was, by that ordinance, expressly authorized to sell part of the cargo for the necessities of the ship during the voyage. (*Ordinance of* 1681, *Book* 2, *tit.* 1. *art.* 19.) And as the money thus raised was considered in the nature of a loan for the repair of the ship, the civil law gave the tacit hypothec, or implied lien. (*Valin's Com. Book* 1, *p.* 343.) This lien is also directly recognized in the new commercial code of France, by which the damage sustained by the owner of goods thus sold is declared to be a privileged debt against the ship, and is placed next in order to the lien for seamen's wages. (*Com. Code, art.* 191, *sub.* 7.) The same principle was contained in the *Consolato del mare*, although that decided, contrary to the opinion of Valin, that the ship owner was not personally responsible for the price of the goods sold, if the ship was afterwards lost before the termination of the voyage. Lord Stowell also seems to admit the lien upon the ship and freight, by implication of law merely, for the injury to the owner of the cargo by the sale or hypothecation of his goods; (3 *Rob. Adm. Rep.* 264;) and this principle has been more than once acted on in the courts of our own country. In the case of *Bulgin v. The sloop Rainbow*, (*Bee's R.* 116,) the goods of the libellant, on a voyage from New-York to Charleston, were sold for the repair of the vessel at an intermediate port, the master having neither funds or credit at that place. Under such circumstances, the district court of the United States for the district of South Carolina held the vessel liable in consequence of the implied lien. And in the more recent case of *The Ship Packet*, (3 *Mason's Rep.* 261,) Judge Story examined the question fully, and declared the existence of the tacit hypothec. If, then, we consider the original parties to this adventure as having an interest in the ship, as tenants in common, separate and distinct from their interest in the goods, upon a share of which the complainants held their security, I am satisfied the owners of the goods had an implied lien upon the vessel for that part of the proceeds of the outward cargo which was taken to pay the expense of repairs. The law in relation to such liens is, that they shall be enforced within a reasonable time, or the ship will not be liable in the hands of a bona fide assignee. But it is sufficient if the party entitled to the lien as-

1832.

The American Ins. Co. v. Coster.

serts his right, in the proper form, after the termination of the voyage in which the charge was incurred, and before the ship sails upon a second voyage. The ordinary mode of obtaining the benefit of the lien is by a proceeding in rem against the ship in the instance court of admiralty. But in cases where this court has the administration of the fund arising from a sale of the ship, in a suit for a settlement of the accounts between the joint owners, it may unquestionably exercise the right of settling all such claims for lien, so as to make an equitable distribution of the proceeds.

I do not consider this case, however, as depending strictly upon the question of maritime lien. Although each of the parties to the original adventure was to furnish their quota of the funds for the purchase of the ship and cargo, and upon their own responsibility, there was in fact a limited partnership between the parties, for the purpose of the voyage, both in the ship and cargo; and the sums paid by each, in the first place, was only in the nature of capital furnished for the adventure. By the terms of the agreement, both ship and cargo were to be sold, on the return of the vessel to New-York, for the purpose of ascertaining the profits of the adventure and distributing the proceeds thereof rateably, after deducting the charges incurred exclusive of the original investments. The complainants having taken their security for the $25,- 000, loaned to Jones & Clinch and Barker & Hopkins, upon that part of their interests in the adventure which was vested in the cargo only, and with the knowledge and consent of the other copartners, they had an equitable right to insist that the part of the partnership fund on which they held their security should not be taken for the benefit of the ship, or be laid out upon other parts of the property in which they had no interest, so long as the rights of all parties could be protected by a different arrangement. As a part of the cargo was taken, to their injury, for the repairs of the ship, an equity arises in behalf of the complainants to have that amount restored to them out of the proceeds of the ship upon which the expense of repairs was properly chargeable. And the assignees took the assignments of that property, charged not only with the lien of the complainants upon the remainder of the cargo, under

their respondentia bond and the assignment of the bill of sale, but also with this equity as against their shares of the proceeds of the ship. All the expenses of the voyage, however, must be borne rateably by all the partners, or their assignees ; and so much of the proceeds of the ship as are necessary for that purpose, and to equalize the expenses between the partners, should first be deducted, so that Coster & Lawrence may not be charged with any more than their just share of the expenses of the voyage. As to them, the owners of the ship and the owners of the cargo were the same ; and they have paid their full share of the repairs on the ship, by their interest in that part of the cargo which was appropriated for this purpose at Calcutta.

If the parties cannot agree upon the amount to which the complainants are entitled under this decision, it must be referred to a master to state the account and report the sums they are entitled to receive out of the proceeds of the ship, including interest from the time those proceeds were received by Coster. And there must be a decree against the defendant Coster for the payment of that amount, with interest from the date of the master's report, together with costs. He having paid the money to the assignees and taken an indemnity, he will be left to his legal remedy against them or their sureties. If any balance remains due to the complainants after appropriating this portion of the proceeds of the ship to the payment of the respondentia bond, they may, if they consider it of any importance, have a decree for that balance against Jones & Clinch. But as both of those defendants have been discharged under the act to abolish imprisonment for debt in certain cases, the decree must be against their property only.

The assignees of Jones under the insolvent act were necessary parties ; and being brought before the court without any fault on their part, it would, in an ordinary case, be correct to give them their costs against the complainants, and to permit the latter to take a decree over against those defendants who have rendered this litigation necessary. (*Weymouth* v. *Boyer*, 1 1 *Ves. jun.* 426.) In this case, however, it appears the assignees of Jones have a fund in their hands, on account of the reserved dividend. I shall therefore leave them to pay their

own costs out of that fund.   And if the complainants do not obtain from the proceeds of the ship, under this decree, the whole amount, in reference to which that dividend was retained, the assignees must pay to them a proportionate share of such retained dividend.