BOSSIEUX (MUTUAL BLDG. FUND SOC. v.). See Case No. 9,977.

---

## Case No. 1,668.

### The BOSTON.

[Cited in The Henry Ewbank, Case No. 6,-376. Nowhere reported. Opinion not now accessible. See Case No. 1,673.]

---

## Case No. 1,669.

### The BOSTON.

### [1 Blatchf. & H. 309.] [1]

District Court, S. D. New York.   Oct. 19, 1832.

PARTIES—ADMINISTRATOR—OBJECTION — SHIPPING —APPOINTMENT OF MASTER —BOTTOMRY—LIENS —PRIORITY.

1. An objection to the competency of an administrator to appear as claimant in a suit in rem, must be taken on his appearance, and before sale of the property and payment of the proceeds into court.

2. An administrator appointed in another state, who has not taken out letters within the jursidiction of this court, may intervene in behalf of his intestate, in a suit in rem in this court against a vessel which was the property of the intestate at his death.

3. In this country, no formalities are necessary to the due appointment of a shipmaster The registry acts of the United States in regard to vessels and their masters, are only designed for the protection of the revenue, and do not affect the validity of a master's authority.

4. Where, upon the death of the master and sole owner of a ship during a voyage, the mate took command, and his name was substituted in the ship's register for that of the former master, and he navigated her for a year, without objection, and with the knowledge of the widow and children and agent of the former master: *Held*, that his acts done in the capacity of master were valid as against the representative of the deceased owner.

[Cited in Seaver v. The Thales, Case No. 12,-594.]

5. The lender upon bottomry is bound to ascertain that the money is necessary for the particular voyage, as well as that the master has no other resources on hand.

6. It seems that the lien of a material man is assignable.

[Distinguished in The Champion, Case No. 2,583; The R. W. Skillinger, Id. 12,181. Cited in The Sarah J. Weed, Id. 12,350.]

7. Ordinarily, the lien of a material man will not be upheld beyond the termination of the voyage for which the supplies are furnished.

[Cited in Marsh v. The Minnie, Case No. 9,-117; The H. B. Foster, Id. 6,291; The Wexford, 7 Fed. 681; The J. W. Tucker, 20 Fed. 133; The Young America, 30 Fed. 792.]

8. Parties who could not sustain an original action in rem, may, sometimes, on petition, be paid out of a surplus remaining in court.

9. This is usually done in cases where the fund would otherwise be paid over to a foreign owner and domestic creditors would be left to a merely personal remedy, against such owner, before a foreign tribunal.

10. Freighters, whose goods are disposed of at a foreign port to raise money for necessary repairs, have a lien upon the vessel for the value of the goods at the port of destination.

[Cited in Dupont de Nemours v. Vance, 19 How. (60 U. S.) 170; Janney v. The Belle Lee, Case No. 7,211.]

[11. Cited in The Champion, Case No. 2,583, to the point that want of jurisdiction to enforce a lien in any particular locality is not fatal to the existence of the lien itself.]

[12. Cited in The Rapid Transit, 11 Fed. 335, to the point that, as between claimants of the same class, the last furnisher of supplies may sometimes be preferred to the first.]

In admiralty. The first libel in this case was filed, in rem, by William Morrison, to enforce a bottomry bond executed to him in Glasgow, in Scotland, on the 3d of November, 1831, by Henry Upton, as master of the ship Boston, an American vessel. In February, 1831, Oliver P. Finlay, at that time master and sole owner of the Boston, died while his ship was on a voyage from Greenock, in Scotland, to Charleston, in South Carolina, and Henry Upton, then chief mate, took command, and carried the vessel into the latter port. He there gave her up to the confidential agent of Finlay, who was also consignee, and was continued by him in command. Upton's name was entered as master in the ship's register, and he was sent back with her to Greenock. The family of Finlay were, at that time, in Greenock, though his domicil, at the time of his death, was at Alexandria, in the District of Columbia. Finlay's family made no objection to the appointment of Upton, as master, and returned with him in the vessel to this country. On the 3d of October, 1831, William D. Nutt, the claimant in these actions, was appointed, at Alexandria, administrator of Finlay, but took out letters of administration at no other place. On the 3d of November, 1831, the Boston being then at Greenock, Upton bottomed her to Morrison, the libellant, as security for a sum of money advanced by him. Morrison, who knew the circumstances under which Upton got possession of the ship, and was advised by counsel that his power to bottom her was clear, purchased the claims of McLelland & Co., creditors of the vessel, for debts incurred by her upon her previous voyage, and for which those creditors threatened to arrest her. None of those debts were incurred for the necessities of the ship for the voyage to which the bottomry referred. One of them was for materials furnished for the necessary equipment of the vessel upon her preceding voyage. To this libel two defences were interposed. The first was the claim and answer of Nutt, as administrator of Finlay, denying the authority of Upton, as master of the Boston, to execute a bottomry bond. The other was

---

[1] [Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]

the answer of Dixon & Co. and others, the libellants in the second suit, asserting the authority of Upton as master, but denying the validity of the bond executed by him to Morrison. The second libel was filed by Dixon & Co., Mitchell & Co. and Pattison & Duncan, merchants and owners of parts of the cargo of the Boston, which were sold by Upton, in Charleston, for the necessary repairs of the vessel. It appeared that, on the 7th of November, 1831, the Boston sailed from Greenock for New-York, but was compelled to put into Charleston for repairs, and that, in order to raise there the necessary money, the master was obliged to sell part of the cargo, being goods, the property of the libellants, who claimed $3,819.18, which was the value at New-York of the goods thus sold. To this libel the other parties interposed claims and answers. The Boston arrived in New-York on the 14th of February, 1832, and, in the following month, the above libels were filed. The vessel was subsequently sold, and the proceeds brought into court to await the determination of the claims.

David B. Ogden and Richard M. Blatchford, for Morrison.

Daniel Lord, Jr., for Pattison & Duncan.

John Duer, for Dixon & Co. and Mitchell & Co.

Seth P. Staples, for Nutt.

BETTS, District Judge. The right of Nutt, the claimant, to intervene, is contested by the libellants in both causes, because he received his appointment as administrator from a foreign jurisdiction, and did not acquire thereby a persona standi in this court. It might be sufficient to say, in answer to this objection, that the suits being in rem, and the vessel having been sold and the proceeds brought into court, the libellants must satisfy the court affirmatively of their right to withdraw the funds, before they will be decreed in satisfaction of the suits, whatever may be the legal rights of the claimant thereto. Had the objection been raised when the claimant first entered an appearance, the court would have been bound to determine his competency to contest the suits. If that decision had been adverse to him, the only consequence would have been a change of parties to the record, or a decree of condemnation and sale of the vessel as by default, and the deposit of the proceeds in court; and, when the libellants sought satisfaction out of the proceeds, the court would, at the mere suggestion of any party showing a slight color of interest, have required evidence of their title, beyond the defaults, before the moneys would have been paid to them. If, then, the foreign administration with which the claimant is clothed, is not deemed sufficient authority for him to interfere with and control the progress of the suits, it would entitle him to intervene as a petitioner, praying that the funds in court may be reserved for the legal representatives of the owner of the vessel, and to put in question the right of the libellants to receive them. The court would feel no difficulty in allowing an administrator, who received his appointment at the place of the owner's domicil, to interfere thus far with respect to proceedings against a vessel not arrested at her home port, and in granting all necessary indulgence to enable the estate to become formally represented in the action. But I am not aware of any benefit a new arrangement of parties would afford. The objection is merely technical, and, if sustained, the only consequence will be an order to reform the pleadings, by substituting an administrator with a New-York appointment. The case is now fully before the court, and a longer delay does not promise advantage to any party. I am disposed to admit the intervention of the foreign administrator to have been proper, at least in so far as his acts may be regarded as invoking the court to retain the funds until the libellants give full evidence of their right to them.

There is less reason to notice objections to the capacity of the administrator to make himself a party to the suits, because, it being yet doubtful whether the fund in court is adequate to the demands of both suits, the libellants stand as antagonist suitors with respect to each other, as well as to the administrator. They have not only impliedly waived their right to object to the claimant's making himself a party, by admitting him to appear and answer, and propounding to him interrogatories and reading his replies; but each interposes a claim and defence in opposition to the particular demand of the other, as respects its right to priority. The court must accordingly, on these issues, determine the rights of the libellants in both suits to a lien on the ship, even if no intervention is made on the part of Captain Finlay's estate, and it may, therefore, be of no immediate moment in the cause, whether the cumulative objections of the administrator are admitted or not. But the question may become one of moment in the practice of admiralty courts, which are largely concerned in disposing of vessels and their proceeds, on demands arising, as in the present cases, beyond their local jurisdiction, prosecuted by foreign creditors, and where the vessels and their proceeds are claimed by owners resident abroad. And, as, from the magnitude of the present demands, the judgment of higher tribunals will probably be invoked in these cases, I think it proper to decide the point, and suggest some of the considerations upon which the decision is founded, in order that an authoritative rule on the subject may be declared by the courts of appeal.

Courts proceeding according to the course of the common law in this country and in

England, disregard, as a general principle, letters of administration emanating from foreign tribunals, and require the representative of a deceased party, so authorized, to procure letters within the jurisdiction where the court sits. Goodwin v. Jones, 3 Mass. 514. There are exceptions to this rule in the practice of particular states. McCullough v. Young, 1 Bin. 63; Glassell's Adm'rs v. Wilson's Adm'rs [Case No. 5,477]; Childress v. Emory, 8 Wheat. [21 U. S.] 642. But it is not important, on this occasion, to investigate the extent of the diversity, or the grounds upon which it rests.

Two principles, it is believed, are common to the jurisprudence of all common law courts—that the administrator has the legal title to the personal assets of his intestate, until final distribution of them is made (Bac. Abr. "Executors & Administrators," H 1; 2 Bl. Comm. 494; Toll. Ex'rs, 80; 2 Griff. Law Reg. 352); and that the ownership and distribution conform to the law of the domicil of the deceased, without regard to the law of the place of his death, or the situs of his property (Toll. Ex'rs, 133; Com. Dig. "Adm." B 11; Harvey v. Richards [Case No. 6,184]). This title is not an absolute property in the administrator, but it clothes him with the right of possession and control of the property, until the satisfaction of debts and legacies, as completely as if he were its proprietor. Slack v. Walcott [Id. 12,932]. Under that title, he may undoubtedly take possession of assets in a foreign country, when not prevented by the local law (Com. v. Griffith, 2 Pick. 11, 14); and a voluntary payment of a debt to him, by a foreign debtor, seems to be an acquittance of such foreign debtor (Doolittle v. Lewis, 7 Johns. Ch. 49; Stevens v. Gaylord, 11 Mass. 256). See Dawes v. Head, 3 Pick. 128; Davis v. Estey, 8 Pick. 475. The impediment to the exercise of the full powers of an administrator, in a jurisdiction foreign to that granting him letters of administration, seems, then, to be the technical objection of the law courts, to his reception on the record as a party. That the incapacity is essentially technical and formal, is manifest, because, the party clothed with administration at the place where the intestate died, is admitted, of course, to administration, where the property of the decedent is found. The latter administration is not even claimed to be an original authorization of representation, but is regarded as only ancillary to that. Harvey v. Richards [supra]; Stevens v. Gaylord, 11 Mass. 256; Davis v. Estey, 8 Pick. 475. A cardinal principle, in which the practice of admiralty courts differs from that of courts of common law, is, that parties prosecute and defend, in the civil law tribunals, upon their rights as existing at the institution of the action, without regard to the state of parties when the right of action or defence accrued, rights of action, or choses in action, as they are termed at law, vesting in their as-

signee, when properly transferred, all the privileges and remedies possessed by their assignor. Accordingly, the party in whom a debt is legally vested, sues for it in his own name, the same as if it were a chattel. The ordinary course of practice would, therefore, well admit a foreign administrator to represent the interest of his intestate in an admiralty court, without the aid of an ancillary commission from the local authorities; and, had the present action been in progress, in personam, against the decedent, I should not feel required to hold his representative, commissioned at the place of his domicil, as disqualified from intervening under his Virginia appointment, answering the libels and contesting the suits in that capacity, when such suits might, in their result, operate as a charge on the assets of the estate. The present proceedings are in rem, and, for the time being, hold the vessel in arrest, and in effect appropriate it to the demands in suit. The fruit of the actions is, to sequester the effects of the intestate, and place them at the disposal of the court. They cannot, therefore, be withdrawn from that custody by the creditors, or by any other party, until the court is satisfied they are applied conformably to the rights of all parties interested in them. The very purpose sought to be attained by the law courts, in requiring an administrator to sue within the jurisdiction which has conferred his authority upon him, is answered in an admiralty court by its established course of procedure; for, notice of the widest notoriety is given, by arrest of the property, to all persons concerned, to make their claims against it, and the property is retained in the custody of the law until the relative rights of creditors are made known and adjusted, which is all, if not more, than can be attained, in courts of law, by force of an administration bond. It is not to be supposed that an administrator could be made liable upon his bond to one class of creditors, for assets allotted to other creditors by the decree of a court of admiralty proceeding against the property in a suit within its jurisdiction. The claimant is thus, manifestly, the real party in interest in this controversy, the law vesting in him the title to the ship, and imposing upon him the duty of protecting it for the benefit of the estate he represents. Accordingly, he is to be directly affected by the decision of the litigation, in whatever way that interest may be represented in court; and I am disposed to allow him to come into court directly, under the capacity and right imparted to him by his letters of administration, without requiring him to subrogate another functionary to perform the same offices, and to the same end. As the law of a decedent's domicil is looked to, to ascertain who succeeds him in the enjoyment and possession of his property, there seems to be a marked propriety in equally noticing who, by the same law, would be the appropriate party to dis-

pose of or reclaim such property. And, particularly, claims in relation to vessels employed in navigation, which, in their normal state of transition, can scarcely be regarded as having any situs, within the acceptation of the law, other than, figuratively, that of the residence of their owners, should, in admiralty and maritime courts, which are, in a great degree, governed by the lex gentium, be pursued or defended in the names of the persons who, by their domicil, have title to the vessels.

I think, then, that on general principles, the claimant has an adequate persona standi in judicio, to intervene in these causes, for the protection of his intestate's estate, and to contest both the validity of the demands brought against the ship, and all claims upon the proceeds in court. Independently of the objection, that the libellants are too late in taking exception to the competency of the claimant, I overrule the exception, on the ground that a foreign administrator is admissible in proceedings in rem, in admiralty, upon his legal title in the property, to contest any suit against it.

The interposition of the administrator varies the issues between the libellants in only one particular of importance. The libellants in each action, in their answer to the rival suit of the others, admit full authority in Upton, as master of the ship, to do the acts set up as constituting the respective liens articled upon, other than that Mitchell & Co. deny that the instrument set up by Morrison is a bottomry bond, entitled to priority of satisfaction over their demand. The administrator, on the contrary, denies that Upton was lawful master of the ship, and that either debt is so created as to become chargeable upon the vessel.

The questions, then, which are raised by the pleadings, are, whether the bottomry bond sought to be enforced in the first action, and the demands set up in the second, are liens upon the vessel; and, if both are so, which has priority of privilege. It is necessary, in the first place, to ascertain what authority Upton possessed, as master, either to bottom the ship, or to sell part of the cargo. For either of these acts, two things must be shown—a valid appointment as master, and that the act was within the scope of the authority conferred.

In some maritime countries on the continent, the mode of a master's appointment is prescribed by law. Jac. Sea Laws, 83, 85, 87. In this country and in England, the law does not interfere in relation to the qualifications or mode of appointment of a master, further than as regards his national character. He is, pro hac vice, the agent of the owner; and any mode of authorization competent to give power to one man to act for and bind another, is sufficient to constitute him master of a ship. The registry act of the United States requires that the name of the master shall be inserted in the register of the vessel (Act Dec. 31, 1792, § 9; 1 Stat. 291); that, on a change of ownership, a new register shall be taken out (Id. 294, § 14); and that, when the master is changed, the register shall be produced to the collector, and a report be made to him, by the owner, or the new master, of such change, whereupon the collector shall endorse a memorandum of the change on the register, and subscribe his name thereto. Id. 295, § 15. None of these provisions, however, whether complied with or not, affect the validity of the master's authority. They are only designed to secure the revenue against the allowance, to foreign vessels, of privileges which only vessels belonging to citizens of the United States are entitled to enjoy. The provision, that a change of master may be reported to the collector by the new master alone, abundantly shows, that congress did not intend that the collector should make any inquiry into the legality or sufficiency of the master's authority. His legal appointment is assumed, upon his producing the ship's register, and he is, accordingly, registered as the master.

In the case before the court, the collector and naval officer of Charleston, on the 14th of March, 1831, endorsed on the ship's register the substitution of Upton, as master, in place of the late master, Finlay. That the authority of Upton, as master, was complete as to all persons dealing with him without notice of the manner in which he acquired command of the vessel, can scarcely admit of argument. He sailed the vessel between the United States and Europe, from March, 1831, to February, 1832, performing all the offices, and exercising openly the powers of master; and, although the manner in which he continued in the command of the vessel, after her arrival in the United States, was peculiar, and without the direct authorization of a legal owner, yet, as such possession continued openly and notoriously for six or eight months, and the vessel made repeated voyages, earning large sums of money from freights and passengers, which were disbursed by Upton, in this country, with the knowledge of those most directly interested in the vessel, it is too late for them now to disavow and repudiate his acts, because of the want of a regular appointment. They must be held to have acquiesced in the authority he assumed, and, by such ratification, to have given to it all the validity it would have derived from the most direct and formal appointment. The Alexander, 1 Dod. 278. At least, it would be most hazardous to trade, and unjust towards all persons putting confidence in a state of things conformable, in all respects, to ordinary usage, to hold that foreign creditors were bound to run the hazard, in their dealings with Upton, of proving that he originally acquired command of the vessel from the legal owner, and by positive appointment. It is enough for them to show that he was in possession

of her, under such circumstances as fairly proved that her owners must know the fact; and the necessary authority for his acts, as master, will then be implied by law.

These considerations establish the right of the libellants in the second suit to look to the vessel or her owners for the performance of the contract of affreightment made with them by Upton. It is contended, however, that, since Morrison knew how Upton came into possession of the vessel, he was bound to acquaint himself with the manner in which he obtained the authority of master, which he subsequently assumed to exercise. There can be no question of the bona fides of dealing with a master of a ship, in a foreign port, in the usual course of business, under circumstances like those which existed in this case; nor can the legal competency of such a master to hypothecate the vessel to a bona fide creditor be doubted. The Alexander, 1 Dod. 278; The Tartar, 1 Hagg. Adm. 1. Even if Morrison is to be presumed to have been cognizant of all the facts connected with Upton's possession of the vessel, I should feel no hesitation in declaring that such possession was rightful, and that all parties interested in the vessel or her cargo were bound by the acts of Upton, in the capacity of master, as long as he was not regularly displaced by the legal owner. He took command on the death of the former master, at sea. The law devolved it upon him as chief mate. The Favorite, 2 W. Rob. Adm. 255. On the arrival of the vessel at her port of discharge, she and her cargo were placed in charge of the consignee and confidential agent of the former master, who supplied her with freight, and, continuing Upton in command, despatched her to Greenock, having had Upton's name entered in the register as master. His authority to appoint a master in case of necessity is fully supported by the authorities. The Alexander, 1 Dod. 278; The Tartar, 1 Hagg. Adm. 1. Finlay was sole owner of the Boston, and, as she was an American vessel, the law of the District of Columbia, the place of his domicil, would, at home and abroad, determine the right of succession after his death. 2 Kent, Comm. 429. The law of Virginia prevails at Alexandria, his place of residence, and is substantially the same as that of England with regard to the distribution of intestates' estates—one-third to the widow and two-thirds to the children. 2 Griff. Law Reg. 352. Although foreign creditors were bound to notice the law of this country, by which the property in the vessel vested, in the first instance, in the administrator of Finlay, yet they are also to have the benefit of the further notice, that such administration belonged, of right, to the widow, and that, whenever she assumed it, she thereby became so fully clothed with power in relation to the vessel as to be able to ratify any antecedent dealings in respect to it. Foreign creditors might thus be re-

garded as having transacted business with Upton with her sanction, under the persuasion that she would assume the character of administratrix on arriving in the United States, and thus qualify herself to carry out fully what the law left at her own option to do. She did not, in fact, exercise her right, but allowed the claimant to take out letters of administration. He was duly appointed on the 3d of October, 1831, one month previous to the sailing of the ship on her last voyage, and there is no evidence that he at any time interfered with the authority of Upton, to disavow or control it. As, by the ancient civil law, the heir is considered as being substituted in place of the deceased, and as taking all his rights and responsibilities in such manner as to maintain a perpetuity and entirety, without succession, with respect to the estate, so the administrator is regarded as continuing in himself all the rights and powers of the owner, until his trust is fulfilled by the satisfaction of all debts and a final distribution of the assets. The foreign creditor had a right to presume, either that the right of property was in the widow, in the capacity of administratrix, by intendment of law, so that her acquiescence in the command of Upton would amount to a competent ratification of it, or that the law had supplied a sufficient representative in her place; or he might be authorized to infer a distribution of the estate to the widow and children, so that the confirmation of Upton's authority might be implied from their permitting it to continue. The bona fides of the transaction is further shown by the fact, that advice was taken of counsel. Under all these circumstances, I can feel no hesitation in declaring the competency of the master to hypothecate the vessel in a case justifying a bottomry loan.

But it is contended, that the giving of a bottomry bond was not authorized by the circumstances of the case. An objection applying to the whole claim included in the bond is, that no part of it was advanced to the ship in aid of the voyage she was about to perform. The libellant was bound to ascertain, before he accepted a hypothecation, whether the necessities of the ship demanded the advances for her equipment for the particular voyage, and whether or not the master had other resources, in the port where the vessel then was, for supplying those necessities. 3 Kent, Comm. 171. Neither of these essential facts being made to appear, I am bound to declare the bottomry unauthorized and void at law. Id. 171, 172; Abb. Shipp. (Ed. 1829) 124, note. The bottomry holder doubtless acted in good faith, and made the loan under the persuasion that a threatened arrest of the ship for prior debts would uphold the bond equally as if the loan had been made to relieve her from actual seizure. This, however, is not the law. The pre-eminent security of bottomry, with its high privileges, is sanctioned only when a

ship is under positive arrest, and cannot take effect when the money is advanced only to avert a menaced arrest. The Aurora, 1 Wheat. [14 U. S.] 105. I attach no importance to the fact that insurance was effected by the bottomry holder on the vessel, as he might, perhaps, be considered as having obtained that for the benefit of the owner, and not for his own security.

The question now arises, whether Morrison has, as assignee, the privilege of a material man, for that portion of the debt which arose from advances made for repairs and necessaries furnished to the vessel on her preceding voyage, so that he can enforce that privilege in the admiralty courts of this country. If the right of lien was a continuing one in his assignors, McLelland & Co., I perceive no objection to its continuance in the libellant, who took an assignment of the debt for a full consideration, at the express instance of the master, and would accordingly be entitled to the legal remedies for its recovery which were possessed by the original creditors. It is unimportant whether the general rule of maritime law obtains in Scotland, that repairs and necessaries form a lien on the ship herself, so that the material men could have enforced their claims against the foreign vessel, by an attachment of her there, because, the remedy will be afforded in conformity to the law of this country, and not to that of the country where the debt accrued. The question is, whether McLelland & Co., the assignors of the libellant, were possessed of a lien. McLelland & Co., having lent money to be employed in the repair of the vessel, and under circumstances reasonably importing that credit was given to the ship in that respect, were, by the rule of the civil law, entitled to a priority of payment out of the ship herself, without any express contract to that effect. Abb. Shipp. (Ed. 1829) 108; American Ins. Co. v. Coster, 3 Paige, 323. Has this right been lost by their having permitted the vessel to leave Scotland, or by lapse of time? By the law of England, the shipwright or material man has a lien on a vessel for necessaries, &c., furnished at home, only so long as she continues in his possession. He may retain possession until he is paid, but, if he parts with possession, or furnishes supplies without taking possession, he cannot enforce a claim upon the vessel herself, as a privileged creditor (Abb. Shipp. 109), the courts of that country regarding a lien only in its meaning and application under the common law. Notwithstanding the opinion of an eminent Scotch writer (1 Bell, Comm. 527) that a vessel would, under such circumstances, be liable to. attachment for such debt in Scotland, there is great reason to question the accuracy of that statement. Clearly, she would not have been liable in England, without an express hypothecation of her, and it is plain, from both Abbott and Bell, that the house of lords and the highest courts in Scotland

are disposed to maintain the same rule of law in this respect in both countries. The English court of admiralty takes cognizance in rem of the lien, when the debt accrued abroad, only in cases where the vessel is expressly hypothecated to secure it. Abb. Shipp. (Ed. 1829) 108, 116. Probably, the acknowledgment of the demand in the bottomry bond, might be deemed, in England, a sufficient hypothecation of the vessel to bind her, for the satisfaction of the debt, to the libellant, as assignee of the creditors who advanced money for supplies, although that bond may be void as a contract of bottomry, reserving a maritime interest. In our courts, the privilege or remedy acquires no additional force from an express pledge of the vessel. Still, the law recognises the validity of such hypothecation. Id. 125, 126, note; The William & Emmeline [Case No. 17,687]. But these specific liens, when recognized and allowed, are not interminable. The creditor, if not limited to the first opportunity for enforcing his remedy upon them, must pursue that remedy with due diligence. Even a bottomry bond becomes void by an omission to enforce it in a reasonable time. Abb. Shipp. 131; Blaine v. The Charles Carter, 4 Cranch [8 U. S.] 328. But there is no express limitation of time declared by the law, within which an action on a bottomry bond must be brought (Hall's Emerigon, c. 9, § 3); and, as the implied privilege has all the efficacy of an express one, it would, by analogy, partake of the same properties in respect to the time in which it might be enforced. Still, as the value of the security by hypothecation consists in the priority of right it confers, whatever destroys such priority, would necessarily reduce the subject of demand to the state of ordinary indebtedness. The lien which supplies a foundation for the proceeding in rem being superseded, no other remedy can be afforded by this court than that which could be commanded on any contract of a maritime character. In the opinion of the supreme court, the priority of a bottomry creditor cannot extend further than the voyage upon which the loan was made. Blaine v. The Charles Carter, 4 Cranch [8 U. S.] 332. There is a manifest propriety in holding tacit liens to restrictions no less guarded. American Ins. Co. v. Coster, 3 Paige, 323. This court has not required that they should, in all cases, be set up before the vessel leaves the port of refitment, for that would not unfrequently destroy the whole benefit of the advance. The court would, however, require very strong proof, before it would allow a lien to be upheld beyond the close of the voyage then in progress. The Utility [Case No. 16,806]. Ordinarily, if the vessel were suffered to leave the place of refitment, the presumption would be, that other security than that of the vessel was looked to by the material man, and the lien would not be sustained without evidence counteracting that presumption. Zane v. The President

[Id. 18,201]. Upon that principle, this demand in behalf of McLelland & Co. for advances made to supply and refit the ship, would have lost its right of privilege on the return of the vessel to Greenock, and would not be enforced there against the ship by attachment, nor here afterwards upon its original merits, or by force of the hypothecation made to the libellant at Glasgow. American Ins. Co. v. Coster, 3 Paige. 323.

But, the vessel having been sold, and the proceeds being in court, this demand, which was originally privileged, and is clearly within the cognizance of the court, may, under certain circumstances, and on petition of the party, be satisfied out of the fund in court, though it could not be made the ground of an original suit. Zane v. The President [supra]; The Stephen Allen [Case No. 13,361]; The John, 3 W. Rob. Adm. 170. Having been, to a certain extent, privileged in its inception, it lost the right of being levied upon the vessel itself, by means of an implied waiver of the lien. Still, as against foreign owners, it would have been recognised in the English .admiralty as an equity entitled to be satisfied out of the remnants and surplus in the registry, arising from the sale of the vessel for other causes. Id. The courts of this country administer the same relief. Gardner v. The New-Jersey [Case No. 5,233]; Zane v. The President [supra]; The Utility [supra]. This would be done to prevent the funds passing over to a foreign owner, leaving the equitable creditor to a personal action against such owner, before a foreign tribunal. The reasons upon which such relief has been afforded do not, however, apply to this case. Morrison is not seeking to arrest the money in his own country, and prevent its being remitted to foreign debtors, but is pursuing it away from home, in the tribunals of the debtor's country. In such case, the money, if withdrawn from the court, will not go to the original debtor, but to his administrator, in the capacity of general trustee, who must apply it according to the legal and equitable rights of creditors, domestic and foreign. Morrison's claim would have no priority of payment in the course of administration; and there seems to be less equity in permitting it to acquire, by decree of the court acting as trustee of the fund, that preference which it would not obtain with the administrator, the regular trustee designated by law. Still, the principle may be broad enough to cover the case, and admit the privilege of the foreign creditors in relation to this surplus; and I am inclined to detain the money a reasonable time, to allow the libellant to present his petition for its application to the advances made for supplies and necessaries furnished the ship at Greenock. I do not definitely decide the point, upon the pleadings and proofs now before me, because the attention of the counsel has not been drawn to the items composing this portion of the debt claimed by McLelland & Co. If the general doctrine is yielded, some part of the charges may not be allowable. None will be paid but such as were originally a lien on the vessel (Sheppard v. Taylor. 5 Pet. [30 U. S.] 675); and, on a petition claiming the funds on that ground, the parties will be prepared to instruct the court fully as to their relative rights. The testimony now in court can be used by either party on that application, should it be made. The libellant, Morrison, having, then, no right of action against the vessel, either upon the bottomry, or as assignee of McLelland & Co.'s lien, his libel must be dismissed, with costs.

The remaining subject for consideration is, the demand prosecuted in the second action. That rests upon the proposition that the shippers of goods on board a general ship, have a lien on her for their value at the port of destination, if they have been disposed of by the master on the voyage, for necessary repairs and refitments to the vessel. This general doctrine has been heretofore considered by this court in the case of The William & Emmeline [Case No. 17,687], and was explicitly adopted by it in the case of The Gold Hunter [Id. 5,513]. The state courts fully recognize the rule of the maritime law on this subject. American Ins. Co. v. Coster, 3 Paige, 323. The evidence shows that the ship, on her homeward voyage, put into Charleston in distress, and that the master, having no other resources for supplying her necessities, caused the goods of the libellants to be sold, and the proceeds to be applied in refitting her. This he had competent authority to do under the exigencies of the case (Abb. Shipp. 245), and the owner is entitled to recover the value of the goods at the port of destination (Id.; 3 Kent, Comm. 173, 175), and may maintain a suit in admiralty against the vessel therefor (The Packet [Case No. 10,654]; American Ins. Co. v. Coster, 3 Paige, 323; Bulgin v. The Rainbow [Case No. 2,116]). A decree will. accordingly, be entered in conformity to these principles, in behalf of these libellants. They are also entitled to costs. After satisfaction of that decree, the claimant will be allowed his costs out of the fund. Let it be referred to the clerk to ascertain the value of the goods so sold, at the time of the arrival of the vessel at this port, and report with all convenient speed.[2] Decree accordingly.

---

[2] This case does not appear to have been subsequently moved in court.