## Case No. 13,361.

### The STEPHEN ALLEN.

### [1 Blatchf. & H. 175.] [1]

District Court, S. D. New York. Nov., 1830.

ADMIRALTY JURISDICTION — MARITIME LIENS — SURPLUS PROCEEDS OF VESSEL.—SUIT IN REM—IN PERSONAM.

1. Courts of admiralty in this country are not limited in their jurisdiction by the rules of the common law.

2. Materials furnished to a vessel in another state than that to which she belongs, create a lien which is enforced in admiralty under the general maritime law.

3. For materials furnished a vessel in her home port, a lien is created, if at all, only under the state law, which lien is enforced, however, in the admiralty courts.

4. Under the statute of New-York, (2 Rev. St. 493) which gives such a lien where a debt of $50 or upwards is contracted a debt of $49, which, by the accumulation of interest, exceeds $50 at the time suit is brought upon it, is not a lien upon the vessel.

5. A right of action in rem, by a material man, for supplies furnished a vessel in her home port, which is lost by a neglect to prosecute within the time limited by the statute, may still be enforced against the surplus proceeds of the vessel in court.

[Cited in The Boston, Case No. 1,669; Remnants in Court, Case No. 11,697.]

6. This right to proceed against such surplus proceeds holds good where a party has a right to proceed in admiralty in personam, though not in rem, on the ground that the court has jurisdiction of the parties, and that the subject or fund is already under its control.

[Cited in The Lady Franklin, Case No. 7,983.]

7. So a master, who has a right to sue in personam for wages, may proceed by summary petition against such surplus proceeds.

The steamboat Stephen Allen, a vessel plying between the city of New-York and Middletown Point, in New-Jersey, was libelled for wages, on the 24th of September, 1830, by William Taws, a seaman employed on

[1] [Reported by Samuel Blatchford, Esq., and Francis Howland, Esq.]

board of her, and, no claim having been interposed, she was condemned and sold, and, after payment of the debt to Taws, the surplus proceeds, amounting to $2,400, were paid into court. Petitions were presented by various parties for the payment of their claims out of the surplus fund. The firm of Heir, Maris & Co. claimed for wharfage, and for wood and materials furnished for the boat at Middletown Point prior to the 12th of September, 1830. Rowley, the master of the boat, claimed for advances made by him for seamen's wages, and for necessary repairs and supplies furnished the vessel prior to the 22d of September, 1830, and also for his own wages. Various material men claimed for supplies furnished and labor performed for the vessel in New-York, her home port, prior to the 11th of September, 1830. Two of these last were for sums more than $50 ($203.50 and $96.76), and two were for sums less than $96 ($5.62 and $49), though the interest upon the one of $49, to the time of the institution of the suit, if added to the principal, would make it exceed the sum of $50. Another petition was presented by Thomas J. Gardiner, praying that the whole of the surplus proceeds be paid to him, and that the other petitioners be postponed to him, he alleging that he was a bona fide mortgagee, without notice of any liens. It appeared that the vessel was registered, and that her papers were taken out, in the name of Thomas Freeborn, on the 6th of November, 1829; that, in December, 1829, Freeborn conveyed her, by an absolute bill of sale, to Gardiner; and that, on the 9th of June, 1830, she was registered in the name of Gardiner, who took the oath that he was her sole owner, and received a coasting license in the same month. Gardiner first petitioned the court for the proceeds on the 2d of November, 1830, and then swore that he was the sole owner of the boat. Several other claims were presented at the same time, and Gardiner's counsel thereupon asked and obtained leave to withdraw his petition, for the purpose of providing fuller evidence in support of his right as owner, which the other claimants announced would be contested. On the 8th of November, 1830, the day assigned for hearing the petitioners, Gardiner presented a new petition, as mortgagee, alleging that the bill of sale was taken by him as collateral security for a loan of $3,000, made by him to Freeborn.

Washington Q. Morton, for Heir, Maris & Co.

Michael Ulshoeffer and Samuel Sherwood, for domestic material men.

Franklin S. Kinney, for Rowley.

Gerardus Clark, for Gardiner.

BETTS, District Judge. The counsel for Gardiner resists the payment of the claims of the other petitioners, upon the grounds (1) that they were never liens on the vessel;

(2) that if they ever possessed that character, it had been lost before Gardiner's rights accrued; and (3) that the matters of the petitions are not within the jurisdiction of this court.

The general jurisdiction of the courts of the United States, in admiralty and maritime cases, is not limited by the rules of the common law. The General Smith, 4 Wheat. [17 U. S.] 438; The Amiable Nancy [Case No. 331]. By the civil law, vessels were liable to the claims of material men, and of those furnishing her with necessary supplies, as well in her home port as in a foreign one. 3 Kent, Comm. 168, note; Com. Dig. p. 42, pl. 5; Id. pp. 26, 34. And it seems that the same rule was understood to prevail in England until the jurisdiction of the courts of admiralty, which alone supported the liens, was taken away. Abb. Shipp. (Ed. 1829) 107–117; The Zodiac, 1 Hagg. Adm. 320, 325; 1 Rolle, Abr. 533; Court de Admiralitie, pl. 19. In this country, the general principle is fully recognised in relation to vessels in a foreign port. North v. The Eagle [Case No. 10,309]; The Jerusalem [Id. 7,294]; The Aurora, 1 Wheat. [14 U. S.] 96; Gardner v. The New Jersey [Case No. 5.233]. But it is so far modified or conformed to the rule existing in England in regard to domestic vessels, that whether there be a lien or not depends upon the local law where the lien is claimed, and not upon the general maritime law. Turnbull v. The Enterprise [Id. 14,242]; Clinton v. The Hannah [Id. 2,898]; Shrewsbury v. The Two Friends [Id. 12,819]; The General Smith, 4 Wheat. [17 U. S.] 438; The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409; The Robert Fulton [Case No. 11,890]. This was the home port of the Stephen Allen. The supplies furnished her in New-Jersey would accordingly, by the maritime law, be chargeable upon the vessel; and the lien which would have attached to the vessel ought in equity to be sustained in respect to the proceeds. This principle will embrace the claim of the firm of Heir, Maris & Co.

The master petitions for the satisfaction of advances made by him for seamen's wages, and for necessary repairs and supplies for the vessel. The wages would be a charge upon the vessel, and many of the other claims, having arisen away from her home port, would have been liens in their origin, and would have fallen within the rule just indicated, had they remained in the hands of the original creditors. The case does not require the discussion of the question whether the master could avail himself of those liens as against the vessel herself, by means of an equitable substitution in the place of those whose debts he discharged, for the questions in this case arise upon the distribution of a surplus, and his claims may be disposed of upon another principle.

The foregoing are the only claims now before the court which, in proceedings in rem, would be enforced under its authority as a maritime court, and without regard to the laws of the state. If the other claims could be entertained originally in this court, as is intimated in The Robert Fulton [supra], the remedy against the vessel would not be under the ordinary powers of the court, but in conformity to the statute law of the state. Those claims are for repairs and supplies furnished the vessel at her home port. The law of the state gives a lien on vessels for work done, materials and supplies furnished, &c., when the debt amounts to $50 or upwards, and is contracted within this state. 2 Rev. St. 493. The claim of John Benson, for $203.50, for work done and materials furnished, comes within the terms of the act, and might have been enforced directly against the vessel, unless the lien was lost by some subsequent occurrence. The claim of John Patterson, for $96.76, rests upon the same footing. The claim of Michael Dougherty, for $5.62, for wharfage, and that of Mersereau F. Breath, for $49, for supplies, &c., also come within the character of debts provided for by the statute, but they are not sufficient in amount to be entitled to the privilege. Nor would the allowance of interest claimed by the petitioners in the latter case obviate the difficulty. The words of the act are: "Whenever a debt, amounting to fifty dollars or upwards, shall be contracted." Whether the debt is privileged or not, must be determined by its condition when contracted, that is, when the services are rendered or the supplies furnished, and no regard can be had to the state of the debt at any period subsequent to that time. If the debt was not a lien when it was created, it cannot become such subsequently. The sum of $49 was, therefore, the whole amount that could come within the provisions of the statute, and that is less than the sum necessary to a lien.

The liens which might have been enforced under the statute in regard to the other debts contracted in this port, were lost by the departure of the vessel therefrom. She plied as a freight and passage-boat between New-York and Middletown Point, from about the 10th of June, 1830, to the 13th of September, 1830, prior to which last-mentioned date all the debts were contracted. By the 2d section of the state statute, the lien ceases at the expiration of twelve days after the day of the departure of the vessel to any other port within the state; and it ceases immediately after the vessel leaves the state. If the waters to Middletown Point be within the jurisdiction of this state, the lien was discharged by the operation of the former branch of this section, and, if they were wholly out of the state, then by the latter; so that, in neither case, could it now be enforced against the vessel as a substantive ground of proceeding. With regard, therefore, to these domestic claims, none of them can attach to the fund in court upon the ground that they are subsisting liens on the vessel, which the pro-

ceeds, as representing her, ought to satisfy; and, if they can be now recognised by the court, it must be upon other principles. The higher remedy once possessed by them, though not acted upon and enforced, will not, however, prevent their coming upon the surplus and remnants, as there is an express recognition of such right in the act. 2 Rev. St. p. 499, § 42. In England, where the admiralty is not permitted to have cognizance of the claims of material men, &c., a practice has been sanctioned in the admiralty, of compensating such parties out of the surplus proceeds in court. The John, 3 C. Rob. Adm. •288. The propriety of affording such relief here would be much more manifest, as the subject matter is within the clear jurisdiction of this court. With us, all contracts for furnishing or refitting vessels are of a maritime character, and may be prosecuted in courts of admiralty and maritime jurisdiction, either in rem against the vessel, or in personam against those liable to pay. The General Smith, 4 Wheat. [17 U. S.] 438. I am aware of the resistance made to this doctrine in the opinion delivered by Mr. Justice Johnson in the case of Ramsay v. Allegre, 12 Wheat. [25 U. S.] 637. That opinion was not, however, delivered as the judgment of the court. The decision in the case was pronounced by another judge, and was concurred in by Judge Johnson, whose opinion was presented as a protestation against the jurisdiction of courts of admiralty, as declared in the case of The General Smith, 4 Wheat. [17 U. S.] 438, and other previous adjudications of the American courts. Judge Johnson labors to bring down the jurisdiction of our courts to that recognised by the common law courts in England as appertaining to the admiralty. Whatever value, therefore, I might be disposed to place upon that opinion as a legal criticism, it cannot have the effect of overturning rules previously established in relation to this subject; nor will it justify my forbearing to apply those rules to the case now before me. It ought to be remarked, too, that as matter of authority, that opinion stands opposed by American jurists of great name,—Abb. Shipp. (Ed. 1829) 111, 116; Zane v. The President [Case No. 18,201],—even if it is not to be considered as in opposition to the adjudication of the supreme court in the case of The General Smith. Without, however, determining the right of the parties referred to, to maintain a suit here, it must now be considered as the well-established course of proceeding in the American courts, to allow material men to be paid their claims out of surplus proceeds in court, without regard to the fact whether they have a lien in existence or not. Gardner v. The New Jersey [Id. 5,233]; Abb. Shipp. (Ed. 1829) 111, 116; Zane v. The President [supra]. And, in my judgment, Mr. Justice Washington, in the case last cited, places this allowance upon the true principle, namely, that the contract is, in its character, a maritime one, and may be enforced by ac-

tion on the instance side of the district court. The remedy in rem may not be allowed, because not supplied by the lex loci; and that law will be observed in relation to the claims of material men in the home port of the vessel. But an action in personam may be maintained; and, as the court has thus jurisdiction over the whole subject matter, it will exercise it, by distributing the fund as if the claims were in actual suit. This principle does not seem to have been adverted to, in the previous cases, as the basis of the interference of the courts with the disposition of the surplus in the registry. So far as can be gathered from those cases, the courts appear to have assumed a quasi chancery authority to dispose of such surplus according to justice, and to have supposed that this anomalous control over the funds was called for ex necessitate rei, and to prevent palpable injustice. Judge Washington has suggested an authority for the exercise of this jurisdiction, of a more elevated character and more consonant to the principles of our jurisprudence. To this may probably be pertinently added the suggestion, that as the funds are to go ultimately to the owner of the vessel, the court will not exercise its discretion in delivering them to him, until justice is done to others who have claims of a maritime nature subsisting against such funds. The act of the court becomes purely judicial, and has relation to a subject and to parties all within its jurisdiction. If there is danger of injustice being wrought by decreeing upon summary petition, it will be competent for the court to require the claimant to commence his action, and the fund would be detained, to abide the event. The determination of the right and the disposition of the money would be made by the same tribunal, and the court could thus see, both that full justice was measured out to all parties, and that no unreasonable delay was allowed.

The claims before adverted to, being all of them suable in admiralty, the court, in the exercise of the broad equity with which it is clothed, will consider them entitled to the advantages which they would have possessed had suits been in actual prosecution in this court for their recovery, and will order their amounts to be satisfied out of the surplus in this court, unless the petitioner, Gardiner, has a priority of claim. The master's claim for his own wages will be placed upon the same footing. It was intimated by Mr. Justice Livingston, that a master might sue in admiralty, in personam, for his wages. The Grand Turk [Case No. 5,683]. The express point has since been decided by Mr. Justice Story, on full consideration. Willard v. Dorr [Id. 17,679]. The master's equity will, accordingly, be the same as that of the other claimants who have no actual lien.

It is, however, urged, that if these claims may come upon the surplus, they are to be postponed to that of the petitioner, Gardiner, who is alleged to be a bona fide mortgagee,

without notice of any liens. I shall not now consider what rule of allowance ought to obtain between a mortgagee and parties situated as these claimants are, where each applies to the equity of the court to be satisfied out of funds not produced by their own acts, or by means of incumbrances belonging to them, and which lie in the registry, subject to be delivered to the legal owners at the discretion of the court; for I shall decide that, with regard to all the creditors of the vessel who are now contending with him for the fund, Gardiner must be considered as her owner, and as possessing only the rights of an owner. The facts in the case show that he should be estopped, as it respects the other petitioners, from denying that he was owner, and from assuming the character of mortgagee, even if the original transaction was a mortgage as between him and Freeborn, which, under the circumstances disclosed, there is great reason to question. I feel compelled to remark further, that the evidence before me gives occasion for a strong presumption that Gardiner has no interest personally in the matter, but has allowed himself to be made use of to cover the interests of some party who keeps himself in concealment. Decree accordingly.