STURM (LATSON v.). See Case No. 8,115.

## Case No. 13,578.

### STURTEVANT et al. v. The GEORGE NICHOLAUS.

[Newb. 449.] [1]

District Court, E. D. Louisiana.    Nov.. 1853.

SALVAGE—QUASI DERELICT—SAVING LIFE—PROPERTY—DEVIATION—AMOUNT OF COMPENSATION—ASSIGNMENT.

1. When a vessel at sea meets with another, on board of which the greater part of the crew are dead, and the rest rendered entirely helpless by disease, it is the duty of the master of the first vessel to interrupt his voyage to take the necessary steps to preserve the lives of the sick, imposed by natural law and the commands of christianity.

2. Such a stoppage or interruption is not such a deviation as would discharge any insurance or render the master civilly or criminally responsible for any subsequent disaster to his vessel.

3. There is no obligation upon the master to lie by, or delay the progress of the voyage for the purpose of preserving property. This would discharge the underwriters from future responsibility.

4. The maritime law and commercial usages do not prohibit the master from deviating under such circumstances, in the exercise of a sound discretion to save property that is imperiled.

5. When a part of the crew of a vessel at sea are dead, and all the rest physically and mentally incapable of providing for their own safety, this is not what is known as derelict, but quasi derelict in the admiralty.

6. In a case like the present, one-third clear of all expenses of the property saved was decreed a liberal allowance.

7. The assignment of a claim for salvage divests the lien originally existing in favor of the salvor, and confers no right upon the assignee to claim reimbursement in a court of admiralty.

[Cited in The Champion, Case No. 2,583; The R. W. Skillinger. Id. 12,181; The Napoleon, Id. 10,011; The Sarah J. Weed, Id. 12,350.]

8. The lien for towage is also divested by an assignment of the claim.

[This was a libel for salvage by A. C. Sturtevant and others against the bark George Nicholaus.]

Durant & Hornor, for libelants.

Benjamin, Micou & Finney, Moise & Randolph, and M. M. Cohen, for interveners.

McCALEB, District Judge. The libelants in this case claim a salvage compensation for services rendered to the bark George Nicholaus, of Hamburg  They allege that they are the master and crew of the bark Sarah

Bridge, of Portland, Maine: and that on the 8th of October last, while on a voyage from Bordeaux to New Orleans, and when they were about forty miles south by east from the South West Pass, they descried a bark under very short sail, and apparently deserted or unmanageable. Her sails were flapping in the wind, and she steered as if no one was at the helm. Believing her to be in distress, they hove to on the Sarah Bridge until the bark came down near them, and they discovered that she was the George Nicholaus, of Hamburg. There was a man on the forecastle, who hailed and begged them to come on board, saying that all on board the George Nicholaus, except himself, were dead. They immediately hove to the Sarah Bridge, and sent the mate, Patrick Cass, and three men, to ascertain the condition of things on the bark. They found four persons alive, but three of them were insensible, and no communication could be held with them, and from the man who had hailed them, they learned that the George Nicholaus had sailed from Navy Bay, on or about the 9th of September, 1853, and was bound to Cardenas, in the Island of Cuba. that shortly after she went out of port all hands fell sick with Chagres fever, and that the captain died when she was eleven days out, and eight of the crew had also died before the time when she was descried by the libelants. These facts were obtained from the man who hailed the Sarah Bridge, and who was found in an extremely feeble condition, and seemed to be somewhat out of his mind, in consequence of sickness and exposure. The log was not written up, and the chronometer was out of order. The bark was in a desperate condition, and would soon have been lost by the action of the winds and waves. The libelants took possession of her, and placed on board Patrick Cass, the mate, and a sufficient number of the crew of the Sarah Bridge to manage and bring her into this port, where she arrived on the 9th of October last.

The service rendered by the salvors was certainly meritorious. but unattended by extraordinary exertion. There was danger incurred in consequence of the existence of a malignant disease on board the George Nicholaus. The extent of that danger can only be estimated by the mortality among those on the ship from the time she left Navy Bay. It is true that no evidence has been adduced to prove that the disease was of a contagious character; but from the facts before it, the court is not at liberty to say that no danger was incurred by the salvors who went into the hold of a vessel evidently infected with a disease, which, within a very few days, had proved fatal to almost every human being on board. The promptitude with which assistance was rendered, also deserves to be favorably noticed. It was a case which called for those very offices of humanity which were performed with alacrity and zeal by the salvors. The saving of life is an ingredient in a

[1] [Reported by John S. Newberry, Esq.]

salvage service which is always highly estimated by the courts. The mere preservation of life, it is true, this court has no power of remunerating; it must be left to the bounty of the individuals; but if it can be connected with the preservation of property, whether by accident or not, then the court can take notice of it, and it is always willing to join that to the animus displayed in the first instance. The Aid, 1 Hagg. Adm. 84. It was, indeed, the duty of the master of the Sarah Bridge to interrupt his voyage for the purpose of taking on board the survivors of the crew of the George Nicholaus, in their suffering state, for the safety of their lives. It was a duty imposed upon him by the first principles of natural law—the duty to succor the distressed, and it is enforced by the more positive and imperative commands of christianity. The stopping for this purpose could not be deemed a deviation from the voyage, so as to discharge any insurance, or to render the master criminally or civilly liable for any subsequent disasters to his vessel, occasioned thereby. But, beyond this, there was no supervening or imperative duty. The master was under no obligation to lie by in order to save property, or to delay the proper progress of the voyage. Any stoppage for such purpose would, of itself, amount to a deviation; and any going out of his course for such a purpose, being wholly unauthorized, would discharge the underwriters from all future responsibility. But the maritime law, looking to the general benefit of commerce, upon a large and comprehensive policy, does not prohibit the master, under such circumstances, from deviating to save property in distress, if he deems it fit in a sound exercise of his discretion. As between himself and his owners, the usage of the commercial world has clothed him with this authority; and in return for such extraordinary hazards, it has enabled the owners to partake liberally in the salvage awarded for the meritorious service, when it is successful. The Boston [Case No. 1,673].

This is certainly not what is known in the admiralty law as a case of derelict. It is rather what has been denominated by the courts, a quasi derelict. The vessel was not abandoned, but the evidence shows that those on board of her were both physically and mentally incapable of doing anything for their own personal safety. She was certainly in a situation of extreme danger and distress. She was entirely at the mercy of the winds and waves, and a few hours of stormy weather, would, we may reasonably conclude, have sealed her fate. I have already stated that the service rendered by the salvors, was not attended by extraordinary exertion. But, to use the language of Mr. Justice Story, in the case of The Boston [supra]: "I should be sorry to lay down any doctrine, by which it should be supposed, that if, in a meritorious case of salvage, derelict or quasi derelict, there was subsequently no great hazard or labor of an exhausting nature, the salvage was

therefore subject to great diminution. I should fear, that such a doctrine would be found as mischievous in practice, as it would be unjust in principle." Upon questions of this nature, a large discretion must of necessity, belong to the public tribunals. It is of great importance, as far as it can be done, to avail ourselves of fixed rules and habits in the performance of a delicate duty, and not to deviate from them, except upon urgent occasions. The rule of salvage in cases of derelict usually is (as has been often said), to give one half. and it has rarely been below two-fifths, of the property saved.

Regarding this as a case of quasi derelict, I am disposed to award a liberal compensation to the salvors, and believe that the proportion of one-third, will be a fair allowance. A case similar to the present was not long since decided by Dr. Lushington, sitting in the high court of admiralty in England. It was a suit instituted by the master, second mate and one seaman, belonging to the American bark Tartar, for salvage. The Tartar, whilst on her voyage from Calcutta to Boston, in latitude 13° north, and longitude 46° west, fell in with a brig with a signal of distress, which proved to be the Active, of the burden of 170 tons, laden with sugar, from Pernambuco to Hamburg. The master of the Tartar, on boarding the brig, found that shortly after she had left Pernambuco, the yellow fever had broken out on board, and had already destroyed seven hands of a crew consisting originally of eleven, including the master: that the master was then actually dying: that of three remaining, one had lost the use of his right arm, and that none of them were acquainted with navigation. In these circumstances the master of the Tartar expressed his wish and readiness to render them any assistance, stating at the same time that he could not compel any of his crew to come on board a ship situated as the Active was. On his return to the Tartar, the second mate and one seaman immediately volunteered, and having been put on board, they succeeded in bringing the ship and cargo safely to Falmouth. The master died soon after they came on board. The value of the ship, freight and cargo, was agreed at £4,300 No opposition was offered to the merit of the salvors, and Dr. Lushington, after stating the circumstances and commenting briefly on the high nature of the services, gave the sum of £1,500, and apportioned £500 to the mate, £400 to the seaman, and £600 to the master of the Tartar, to meet any claims of the owners, for whom no appearance had been given. Here it will be seen that something more than one-third was awarded, and although the value of the property saved is greater than in the case now before the court, it will also be seen that the circumstances under which the services were rendered were such as to enhance the compensation beyond what I feel it my duty to allow in the present instance. The

value of the property saved in this case, as appears by the account sales rendered by the marshal, is $4,500. Of this sum I award $1,500 to the salvors free of all costs and charges.

Before I proceed to apportion this amount to the salvors, it becomes necessary to decide certain questions of law which were pressed upon the attention of the court in the arguments of the proctors at the bar. It appears by an assignment on the record, that the first mate of the Sarah Bridge, Patrick Cass, has transferred his claim for salvage to Appleton Oaksmith of New York, and the consideration of the assignment is stated to be the sum of $150. It is contended by the proctor of a portion of the salvors, that Patrick Cass, the mate of the Sarah Bridge, is no longer before the court, his lien for salvage having been extinguished by payment; and that the transferee of his claim has no right, in virtue of the assignment, to demand from a court of admiralty reimbursement of the sum advanced.

This proposition in law involves no intrinsic difficulty. An assignment of a claim for salvage, divests the lien which originally existed in favor of the salvor, and consequently confers no right in the assignee to claim a reimbursement in a court of admiralty. The reasoning of Judge Conkling of the Northern district of New York in the case of Patchin v. The A. D. Patchin [Case No. 10,794], though a case of seaman's wages, is equally applicable to the claim of a salvor. "It was correctly urged by the counsel for the petitioner," says the court, "that in cases arising ex contractu, the admiralty jurisdiction depends on the nature of the contract; and it is true, also, that this jurisdiction is not always confined to the immediate parties to the contract. Thus a bottomry bond is assignable and may be enforced in the name of the assignee. But bottomry is an express hypothecation, and binds the ship to the lender and his assigns. So also is a bill of lading assignable, or rather negotiable, and the holder may in this country maintain an action in the admiralty upon it in his own name. But the quality of negotiability is given to this instrument by law for the benefit of trade, and its transfer, moreover, carries with it the title of the goods shipped and of course the right to maintain a suit upon it for their value in case of their loss. This right of the mariner to proceed against the ship in specie, is conferred upon him for his own exclusive benefit. It arises by implication, and exists independently of possession. Its object is the more certainly to secure to him the hardly earned fruits of his perilous and useful services. When, therefore, his wages are paid, no matter by whom, the design of the privilege is answered; and to say the least, it is very questionable whether he would be benefited by the capacity to transfer it to another; for if this power would sometimes

enable him to obtain immediate payment, it would also expose him to imposition through his credulity and proverbial improvidence. * * * Implied liens are admitted with unsparing caution by the common law. Being allowed for the benefit of trade, they are limited to that object, and are held also to be strictly personal. The right of lien depends on the actual possession by the person claiming it, of the goods to which it is attached; and if he parts with the possession, the lien is irretrievably lost. In the absence of any authority to the contrary, I am of opinion that the mariner's lien ought in like manner to be considered as restricted to its design, and as merely personal. The petitioner cannot justly complain of being denied the privilege of maintaining a suit in rem in the admiralty; the ordinary forms of remedy in favor of an assignee of a chose in action, are open to him in common with all others."

While I consider the reasoning of the court in the case here cited in all respects applicable to the lien in favor of a salvor, and while I am clearly of opinion that the intervening libel of Mr. Oaksmith, the assignee of the claim of Patrick Cass, must be dismissed for want of jurisdiction in this court to entertain it. I am equally clear in the opinion that the object which the proctor had in view in urging his objection to the recognition of the claim, cannot be accomplished in this case. The objection has been presented on behalf of the master of the Sarah Bridge, and was doubtless pressed upon the attention of the court with the hope that, if successful, it would have the effect of causing the share of the mate, who appears from the evidence to have been the principal salvor, to enure to the benefit of the master and the other co-salvors. Such a result would by no means follow, and certainly under the circumstances of this case, would be justified upon no principle of law or equity. There has been no forfeiture of the claim of the mate in consequence of any fraud, embezzlement or other malpractice, which calls for his punishment at the hands of the court; and while his co-salvors are entitled to a full reward for their respective services, they have no right to demand the amount of remuneration which is justly due for his skill, trouble and exertions.

It is also proper for me to remark that the assignment in this case has not been regarded by the court as a criterion by which the share of the master was to be determined in the mode of distribution. It will be seen that he is entitled to more than the amount set forth as the consideration of the assignment. This overplus he must be permitted to receive upon the final distribution, while the balance of his share will enure to the benefit of the owners of the George Nicholaus, or more properly to the holders of the bottomry bond. It is to them the assignee, Mr. Oaksmith, must look for reim-

bursement of the amount advanced. At any rate this tribunal can give him no relief.

The intervening libels filed on behalf of the survivors of the crew of the George Nicholaus, must also be dismissed. It is unnecessary to decide whether or not their contract with their own vessel was dissolved by the death of the master and the balance of the crew; for admitting that it was, there is no evidence upon the record to show that they rendered any service which would justify this court in awarding them a compensation in the nature of salvage. All the evidence adduced shews, on the contrary, that they were physically incapable of rendering any assistance to the salvors. They were utterly unable to do anything either for their own personal safety or for the safety of the vessel.

The intervening libel of Mr. Oaksmith for towage, must also be dismissed for the reasons already given for refusing to entertain jurisdiction of his claim as assignee of Patrick Cass. It is founded upon an assignment which destroys the original lien, and this court has no power to grant relief. In order to render the mode of distribution clearly intelligible, I shall present the share of the mate as it would have appeared in the absence of any assignment. He will be permitted to receive, however, only the amount over and above the $150, the consideration of the assignment. From the very liberal allowance awarded to the master of the Sarah Bridge must be deducted the sum of $20, for pilotage due to the intervening libelant, John Perrin. The costs of court will be deducted from that portion of the proceeds of the property which will accrue to the owners of the George Nicholaus, or more properly to the holders of the bottomry bond; for the sum which may remain after the payment of all necessary costs and expenses, will necessarily be absorbed by the claim of the holder of the said bond.

I have stated that I should award one-third of the value of the property to the salvors. That value is ascertained to be $4,500. The third of that sum will be $1,500. Of this amount I shall award the usual proportion of one-third to the owners of the Sarah Bridge, $500 leaving the sum of $1,000 to be distributed among the salvors, viz: the master, mate and six seamen, $1,000. This amount I shall divide into twenty shares of $50 each, to be apportioned as follows: To the master I shall award nine shares amounting to $450, from which sum will be deducted pilotage, $20; to the mate, four shares, $200 ($50 only to be actually paid); to the seamen, McClelland, who remained constantly on board the George Nicholaus, I shall award two shares, $100; and to each of the other seamen, five in number, I shall award one share, as follows: to Wm. H. Smith, $50, to David Graves, $50; to John Hall, $50; to Patrick Powers, $50; to John De Pape, $50.

### Recapitulation.

| | | | |
|---|---|---|---|
| Aggregate amount of salvage | | | $1,500 |
| Owner's proportion, one-third | | $ | 500 |
| Master's " including pilotage | | | 450 |
| Mate's " | | | 200 |
| McClelland's " | | | 100 |
| Smith's " | | | 50 |
| Graves's " | | | 50 |
| Hall's " | | | 50 |
| Powers's " | | | 50 |
| De Pape's " | | | 50 |
| | | | $1,500 |