488 F.2d 880
 A. L. VEVERICA, d/b/a A. L. Veverica Salvage Co., Plaintiff-Appellant,
v.
DRILL BARGE BUCCANEER NO. 7, her engines, furniture, tackle,
apparel, etc., In Rem, and Jerry D. Ward, d/b/a
Buccaneer Drilling Company, In Personam,
Defendants-Appellees,
American Bank & Trust Co. of Lafayette et al., Intervenors-Appellees.
 No. 73-1211.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 25, 1974.
Rehearing Denied Feb. 22, 1974.
 
 James L. Wheeler, New Orleans, La., for plaintiff-appellant.
 Jim Ortego, New Orleans, La., for Jerry Ward.
 W. Gerald Gaudet, Lafayette, La., H. Barton Williams, Overton T. Harrington, Jr., New Orleans, La., for American Bank & Trust.
 Roger I. Dallam, Gretna, La., for Independent Towing.
 N. B. Barkley, Jr., W. J. Larzelere, Jr., Terrence C. Forstall, New Orleans, La., for Hunt Tool Co.
 Alvin W. La Coste, New Orleans, La., for M & L Boat, T & L Boat, Guidry Enterprises, Galliano Towing, Les-Tie, TBS Towing, and Independent Towing.
 William S. Stone, New Orleans, La., John W. Hutchinson, Lafayette, La., Ronald J. Rakosky, New Orleans, La., for Drill Barge Buccaneer No. 7 and Jerry D. Ward.
 Before BELL, COLEMAN and RONEY, Circuit Judges.
 BELL, Circuit Judge:
 
 
 1
 This appeal involves the validity and ranking of claims on sale proceeds of a vessel seized in rem. Under the lower court's judgment there would remain for the owner,[1] after payment of costs and lien claims deemed valid, about $17,000 of the $50,000 proceeds. We affirm in part and reverse in part, ruling that appellant, a contract salvor who has lost his maritime lien, may take remnants and surplus ahead of the owner.
 
 
 2
 The Buccaneer #7 is a floating drill barge which capsized and partially sank in shallow inland waters in May, 1970. In late June, 1970, appellant entered an agreement with the vessel's charterer[2] by which he would salvage the Buccaneer for $75,000 on a no-cure no-pay basis. On July 3, after work had commenced, the agreement was amended to recognize that it would take some time for the owner to obtain insurance proceeds, and that therefore right to payment would be deferred until the insurance proceeds were received, but not longer than 12 months. The salvage operation proceeded to a successful conclusion over a period of two weeks.
 
 
 3
 During the latter part of July, 1970, appellant engaged in discussions with Edgewater Oil Company concerning assignment of the salvage contract. On August 3, 1970, appellant filed this action and seized the vessel. On August 6, he signed an agreement finalizing the Edgewater assignment for $28,000.
 
 
 4
 Appellant's interest in the vessel was contested not only by the owner, appearing as claimant, but also by various intervenors who filed in rem claims. Several of these intervening claims were liquidated by default and consent judgments to which neither the owner nor appellant objected. In May, 1971, the vessel was sold and the proceeds were deposited in the court's registry pending determination of the validity and ranking of the various claims. The case was referred to a magistrate as special master, and the district court adopted his findings, conclusions and recommendations. The resulting order permitted recovery by certain of the intervenors, with the remnants and surplus of and from the proceeds going to the owner. Appellant was treated as a general creditor and was denied all participation in the proceeds. This appeal followed, with victorious intervenors responding as appellees.
 
 
 5
 The decision of the lower court was based upon four alternative grounds, any one of which would have been sufficient to preclude appellant's recovery. For one, it was concluded that no lien had been created by either the salvage contract or the salvage operation itself. The court also found that if a lien had been created, it was waived by appellant's failure to abide by the agreement to defer payment-the vessel was seized within one month of the salvage. Further, the lower court concluded that even if a lien had been created and was not otherwise waived, salvage liens are extinguished by assignment. Finally, recovery was denied on the theory that appellant was not the real party in interest within the meaning of Rule 17, F.R.Civ. P., in that he had assigned his lien rights, if any, contemporaneously with filing the complaint.
 
 
 6
 Despite these multiple bases for completely denying appellant's claim, the district court also ruled that if there were an enforceable lien it could be for no more than $28,000, the price paid by Edgewater. This was done on the theory that while a salvage contract may be binding between the parties, as to prior lienholders it is subject to an equitable determination of reasonableness.
 
 
 7
 Our view of the case is that the salvage contract created a lien, but that the remedies accorded by the lien were suspended until payment was due. Thus, appellant had no right during the suspension period to seize the vessel, and also no right to participate in the proceeds as a lienor. However, we also hold that appellant's claim is one which may be satisfied from remnants and surplus. Finally, we rule that neither the real party in interest issue nor the assignment to Edgewater defeat appellant's claim.
 
 I.
 
 8
 The initial question is whether appellant's services gave rise to a salvage lien against the Buccaneer #7. As indicated by 46 U.S.C.A. Sec. 953,[3] admiralty recognizes two methods of creating a lien for salvage services, by pure salvage and by contract. The first of these is discussed in The Sabine, 1880, 101 U.S. 384, 25 L.Ed. 982. See also Fort Myers Shell and Dredging Co. v. The Barge NBC 512, 5 Cir., 1968, 404 F.2d 137, 139. As is consonant with the theory of the pure salvage lien, the cases require not only success in the salvage operation, but also that it be performed in the face of marine peril, and that the service be rendered voluntarily and not to fulfil a contractual duty. The Sabine, supra. To dismiss appellant's contention that he has a pure salvage lien we need only note that his services were provided pursuant to a contractual duty.
 
 
 9
 Appellant's claim to a contractually based salvage lien is countered by two arguments. The first is that under the contract's terms credit was extended to the owner, not the ship. See The President Arthur, 1929, 279 U.S. 564, 49 S.Ct. 420, 73 L.Ed. 846. The intervenors support this argument by pointing to the facts that the contract does not specifically bind the ship, and that appellant was expecting payment from insurance proceeds. We think these facts inadequate to defeat the lien in light of Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co., 5 Cir., 1958, 261 F.2d 861. In that case, the materialman sold his goods directly to the vessel's owner, and not only obtained a promissory note and a chattel mortgage on the vessel, but also a mortgage on real estate "as additional security for the said obligation." The documents did not specify that any maritime lien was retained. On the basis of 46 U.S.C.A. Sec. 971 (which declares that to create a maritime lien it shall not be necessary to allege or prove that credit was given to the vessel), the court ruled that a lien arises from the furnishing of services to a vessel "unless it is affirmatively established that it was done solely on personal credit." 261 F.2d at 867. Under this authority, the intervenors must point to evidence which "might permit the inference that the supplier purposefully intended to forego the valuable privilege which the law accords and look solely to the owner's personal credit." Id. This they have failed to do, so we must recognize a lien. See also The Crustacea, 5 Cir., 1966, 369 F.2d 656, 660.
 
 
 10
 The intervenors also contend that the deferral of payment for up to a year operated to waive the lien. We are convinced to the contrary. The very purpose of maritime liens is to encourage necessary services to ships whose owners are unable to make contemporaneous payment. Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 1920, 254 U.S. 1, 9, 41 S.Ct. 1, 3, 65 L.Ed. 97, 101. In order to preserve this source of credit, and in order to facilitate ordinary and reasonable commercial practices, we align ourselves with those early cases which held that credit of a duration consistent with the lien does not waive the lien, but merely suspends the remedy on the lien until its expiration. See The Napoleon, E.D.Wis., 1877, 17 F.Cas. 1150 (No. 10,011); The Kearsarge, D.Maine, 1855, 14 F.Cas. 165 (No. 7,634); The Antarctic, D.Mass., 1852, 1 F.Cas. 1037 (No. 479); The Nestor, C.C.D.Maine, 1831, 18 F.Cas. 9 (No. 10,126). Further, we find no inconsistency between a salvage lien and a year's credit.[4]
 
 II.
 
 11
 Had appellant honored the credit he extended we would have no difficulty recognizing and enforcing his lien. He chose, however, to prematurely seize the vessel, and we therefore must determine the effect of that action. As will be seen, we conclude that by so doing appellant waived his salvage lien.
 
 
 12
 The concept of a premature libel arose in three early cases. See The Falcon, S.D.N.Y., 1874, 9 F.Cas. 743 (No. 5,078a); The Antarctic, supra; The Nestor, supra. These cases recognized that failure to honor an agreed period of credit was a defense to an in rem proceeding. They permitted liens subject to an extension of credit, but they treated them as inchoate, remediless liens until the credit periods expired. On the basis of both equitable and commercial considerations, we think that these principles are wholly applicable to appellant's case. He cut off the possibility that after repair the ship's earnings could be used to pay its lienors. By so doing he has deprived the owner of a promised grace period, and he has prejudiced any subsequent suppliers who might have relied on the salvor's willingness to defer action on his superior lien. We are unwilling to open the extraordinary and costly in rem remedy to those who have so little regard for their own agreements and the reasonable expectations of others. Further, we are supported in this approach by the analogous executory contract doctrine, which denies in rem remedies to claimants who have not themselves fully performed their duties under the contract on which they base their claims. See The Yankee Blade, 1857, 19 How. 82, 60 U.S. 82, 90, 15 L.Ed. 554, 556; The Helen, 5 Cir., 1951, 189 F.2d 148. While we do not rule on whether appellant's failure to wait out the year rendered the salvage contract "executory," we do refer to this doctrine for the proposition that admiralty courts are not bound to accord full protection to those who, for whatever reason, have failed to execute their own contractual duties.
 
 
 13
 Appellant's arguments on this point are not persuasive. He seeks to justify the early seizure as necessary to protect his lien against erosion by later maritime services, but this ignores the fact that his salvage lien, assuming maturity, would have priority over repair and supply liens, and that any subsequent services enhancing the Buccaneer's value would accrue to his benefit if seizure later became necessary. The William Leishear, D.Md., 1927, 21 F.2d 862. See also, Great Lakes Towing Co. v. St. Joseph-Chicago S. S. Co., 7 Cir., 1918, 253 F. 635. He also points out that neither the owner nor the other lienors objected to the seizure as premature. Whether or not this would have merit were the owner the only claimant, we need only point out that this case involves third parties who had valid matured liens on which they could libel the ship at any time. They were within their rights when they chose to permit the libel to take its natural course, and this choice should not now serve to relieve appellant of the burden of a proceeding he precipitated.[5]
 
 III.
 
 14
 After payment of maritime and non-maritime liens, a portion of the proceeds of sale will remain in the district court's registry. That court would have paid this amount to the ship's owner. We reverse on this point, and hold that remnants and surplus should go towards satisfying appellant's non-lien maritime claim. This approach is not, as we shall demonstrate, unprecedented. Further, we consider it to be completely consonant with Justice Bradley's opinion in the second Lottawanna case, 1875, 21 Wall. 558, 88 U.S. 558, 22 L.Ed. 654, which permitted non-maritime lienors to receive surplus proceeds:
 
 
 15
 "The court has power to distribute surplus proceeds to all those who can show a vested interest therein, in the order of their several priorities, no matter how their claims originated. . . . The propriety of such a distribution in the admiralty has been questioned on the ground that the court would thereby draw to itself equity jurisdiction. . . . But it is a wholesome jurisdiction very commonly exercised by nearly all superior courts to distribute a fund rightfully in its possession to those who are legally entitled to it; and there is no sound reason why admiralty courts should not do the same."
 
 
 16
 88 U.S. at 582, 22 L.Ed. at 664. Concerning the equitable nature of an admiralty court's powers, see the discussion and citations in Cates v. United States, 5 Cir., 1971, 451 F.2d 411 at 414 and note 8.
 
 
 17
 The precise question before us is whether appellant acquired the type of interest in the Buccaneer which under The Lottawanna permits a court of admiralty to give him preference over the owner and any general creditors who may be awaiting the owner's receipt of remnants and surplus. In concluding that appellant did acquire such an interest, we are greatly impressed by the fact that his claim is of maritime origin, and is one which under ordinary circumstances would have accorded him a high priority lien. It is appellant's services which have preserved the ship, and which have made it available in this admiralty proceeding. While appellant's premature seizure has cost him his privileged position, we do not believe it should deny him all rights to participate in the sale proceeds. We think that he retained an interest in the vessel which an admiralty court can protect, and that his claim is such that it should not be subjected to the uncertainties of non-maritime remedies against the owner, or worse yet, to the possibility that it be ranked by a non-maritime court against the claims of other creditors. Cf. The Willamette Valley, N.D.Cal., 1896, 76 F. 838, 849-850, 852-854, where the court refused to entertain various non-maritime claims to remnants and surplus on the grounds that they could be more appropriately ranked by state courts.
 
 
 18
 Our holding is not without precedential support. In several early cases maritime non-lien claimants were granted access to remnants and surplus, although they could not have libeled the vessels themselves. See The Stephen Allen, S. D.N.Y., 1830, 22 F.Cas. 1250 (No. 13,361); The Boston, S.D.N.Y., 1832, 3 F.Cas. 918 (No.1,669); The President, C.C.E.D.Pa., 1824, 30 F.Cas. 909 (No. 18,201). More recently, in The Astoria, 5 Cir., 1922, 281 F. 618, this court awarded remnants and surplus to a nonlien supplier of maritime services. As in appellant's case, the supplier in that case had been the initial libelant, despite having no lien, but the sale had proceeded on the basis of liens in favor of intervenors.
 
 
 19
 We are aware of considerable authority that is seemingly to the contrary, speaking in broad terms of the necessity of a lien to participate in an in rem proceeding. We note, however, that most of this authority concerns claims which do not under any circumstances give rise to maritime liens. See e. g., The Atlantic City, 3 Cir., 1915, 220 F. 281 (shipbuilding contract); The Lydia A. Harvey, D.Mass., 1898, 84 F. 1000 (claim of insurer who salvaged vessel in his own interest); The Willamette Valley, supra, (claim of surety who posted bond for release of ship; claim based on state court judgment; claims based on certificates of owner's receiver issued to non-maritime creditors; and wage claim of ship's master).
 
 
 20
 Of more concern is the Supreme Court's decision in The Edith, 1877, 94 U.S. 518, 24 L.Ed. 167. The Court was primarily concerned with whether the libelant had met the statutory requirements for preserving his state law lien, and also with whether the lien had been discharged, under the state statute, by the posting of a bond. After deciding these issues against the libelant, the Court closed with the following paragraph:
 
 
 21
 "It need hardly be added, that though a proceeding in rem and a petition for payment of a claim out of proceeds of a sale remaining in the registry are distinct things-the former proceeding on the ground of a lien-yet no one except an owner is entitled to payment out of the registry, unless he has a lien upon the fund therein. The court can marshall the fund only between lien-holders and owners."
 
 
 22
 94 U.S. at 523, 24 L.Ed. at 168. We note initially that the preceding statement is not the principal holding of The Edith, and that it is presented without the benefit of discussion or of any effort to recognize, distinguish or overrule earlier contrary cases. See The Stephen Allen, supra; The Boston, supra; The President, supra. Further, we note that this cryptic paragraph has not been treated by this circuit as conclusive of the issue, see The Astoria, supra, nor has it been so viewed by at least one commentator. See Gilmore & Black, The Law of Admiralty 647-49. Most importantly we note that The Edith is factually different from the case before us. There, the claimant's only interest in the vessel itself had been created and lost under state law. That claim, albeit of a maritime origin, was not such that a court of admiralty would have recognized it, independently of state law, as the basis of a lien. By contrast, we deal here with a claim whose origin is the performance of services which admiralty courts have long recognized as creating a very high order interest in the vessel.
 
 
 23
 Basically, The Edith and related cases stand for the propositions that a special interest in the vessel is required for participation in the proceeds of sale, that state law created no such interest in those cases, and that the claims were not such that an admiralty court would, independently of state law, recognize such an interest. We do not disregard those cases. Rather, we hold that appellant's services were such that he acquired, despite his premature libel, an interest in the Buccaneer within the scope of The Lottawanna, supra. While this interest is of less stature than the ordinary maritime lien, it nonetheless is sufficient for appellant to take remnants and surplus ahead of the owner and his general creditors.
 
 IV.
 
 24
 Rule 17(a), F.R.Civ.P., provides that "every action shall be prosecuted in the name of the real party in interest." The district court concluded that, by virtue of the assignment of the salvage contract to Edgewater, appellant was not the real party in interest. On this basis it would deny any recovery. Appellant, on the other hand, argues that the case is governed by Rule 25(c), F.R.Civ.P., which provides that an existing action may continue in the name of the original party, despite transfer of his interest, until the court orders a substitution. Appellant points out that the transfer of interest was not formalized until two days after this suit was filed. The district court based its ruling on the finding that, "the filing of the suit and the sale to Edgewater appear to be part of a simultaneously arranged transaction, whichever came first." We think this finding of fact insufficient to support dismissal on the basis of Rule 17(a).
 
 
 25
 Dismissal might be justified upon a finding that assignment occurred prior to filing, although even in that case it may be that the district court failed to comply with the requirement of Rule 17(a) that, "no action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest." Cf. American Dredging Co. v. Federal Insurance Co., S.D.N.Y., 1970, 309 F.Supp. 425, 429 (30 days to appear after court's resolution of uncertain real party in interest question).
 
 
 26
 The district court stated that it had "no assurance that if it paid Veverica money admittedly belonging to Edgewater, these funds would reach the nonappearing Edgewater." We note that the district court could have just as effectively protected Edgewater by utilizing Rule 25(c) to order its joinder or substitution.
 
 V.
 
 27
 The district court also concluded that salvage liens are extinguished by assignment. Assuming that appellant's non-lien right to remnants and surplus is controlled by whatever rule governs assignability of liens, we disagree. There is no federal appellate authority on this issue. The court below relied on The George Nicholaus, E.D.La., 1853, 23 F.Cas. 333 (No. 13,578). That case in turn relied upon The A. D. Patchin, N. D.N.Y., 1850, 18 F.Cas. 1290 (No. 10,794), which dealt with seamen's wage liens. We note that both of these cases date from a period when liens now readily assignable were sometimes thought to be extinguished by assignment. Compare The Napoleon, E.D.Wis., 1877, 17 F.Cas. 1150, 1152 (No. 10,011), with The Rupert City, W.D.Wash., 1914, 213 F. 263, 266, and The S. T. Evanthia, D. N.J., 1954, 1955 A.M.C. 340, 345-346. Further, we are not convinced by the lower court's reasoning that, "It is undeniable that a salvor is highly compensated because of the risk to himself and his equipment, but a claim buyer who incurs no such risks must not expect a court to accord the same liberality." In the first place, this smacks of an argument for reducing an award in pure salvage, where risk is important, see The Sabine, supra, not for entirely denying a claim of contract salvage. Second, The George Nicholaus and The A. D. Patchin are based on the premise that non-assignability protects impecunious lienors against selling their rights at improvidently low prices. While this paternalism may have some justification as to wage claims, it seems quite irrelevant as to commercial salvors; indeed, a prohibition on assignment would seriously hamper salvage businesses which are short of working capital and which thus depend on prompt realization of accounts receivable to finance their operations.
 
 
 28
 Appellant's other contentions are without merit and need not be discussed.[6]
 
 
 29
 Affirmed in part, reversed in part, and remanded with direction that a judgment be entered awarding remnants and surplus to appellant.
 
 
 
 [1]
 Throughout this opinion we use the term "owner" to refer to the ship's owner before the sale, Rebel Pipe & Supply Co., Inc
 
 
 [2]
 Both the charterer, Buccaneer Drilling Co., and the owner are controlled by the same individuals. No issue has been raised as to the charterer's authority to obtain services on the credit of the vessel
 
 
 [3]
 This section of the ship mortgages chapter of 46 U.S.C.A. defines "preferred maritime liens": "A lien . . . for salvage, including contract salvage."
 
 
 [4]
 We note that 46 U.S.C.A. Sec. 730 provides a two year period of limitations for salvage suits, and that the rules for ranking liens by their dates recognize the possibility of liens in excess of one year old. See Gilmore & Black, The Law of Admiralty 605-06
 
 
 [5]
 We note that this is not a case in which lienors sought to take advantage of a superior lienor's extension of credit by libelling the vessel prior to maturity of the superior lien. Since those facts are not before us, we need not consider the type of protection, if any, that should be extended such a superior lienor
 
 
 [6]
 The district court also ruled that even if appellant had an enforceable lien, it would be only for $28,000, despite the $75,000 figure in the contract. In reducing the claim to the amount for which it was assigned to Edgewater, the lower court relied on The Fort Wayne, S.D.Ohio, 1861, 6 F.Cas. 119 (No. 3,012). In that case an agreed salvage contract was greatly reduced on a holding that prior lienholders, who are not parties to the agreement, are bound by it only to the extent it is reasonable. Given our treatment of this case, and the fact that remnants and surplus are less than $28,000, it is not necessary to consider the correctness of this ruling. We note however that it is premised on the existence and protection of prior maritime claims, and we thus assume that the district court did not intend that it affect such in personam rights as the parties may possess and hereafter seek to enforce